**Raymond FINK, Plaintiff**

v.

**PRINTED CIRCUIT CORPORATION, Glen Kashgegian and Michelle O'Donnell, Defendants.**

**No. CIV.A.00–40202–NMG.**

United States District Court, D. Massachusetts.

April 25, 2002.

Bruce E. Hooper, Worcester, MA, for Plaintiff.

Joseph H. Aronson, McCormack & Epstein, Boston, MA, for Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiff Raymond Fink ("Fink") brings this disability discrimination action against his former employer, Printed Circuit Corporation ("Circuit"), the President of Circuit, Glen Kashgegian ("Kashgegian"), and the company's Human Resources Manager, Michelle O'Donnell ("O'Donnell"), alleging, *inter alia*, intentional violations of 1) the Americans with Disabilities Act ("the ADA") 2) 42 U.S.C. § 1981a and 3 the Massachusetts Anti–Discrimination statute, M.G.L. c. 151B and negligent infliction of emotional distress. On December 3, 2001, Fink notified this Court that he will not pursue his claims of age discrimination and intentional infliction of emotional distress.

This action, brought under the American With Disabilities Act and 28 U.S.C. § 1981a, is here under federal question jurisdiction. Fink also asserts discrimination claims pursuant to Massachusetts Civil Rights Act, M.G.L. c. 151B. Venue is properly established under 18 U.S.C. 1391. The plaintiff resides in Leominster, Massachusetts, defendant Circuit has its principal place of business in Woburn, Massa-chusetts and defendants Kashgegian and O'Donnell reside in the Commonwealth.

Prior to filing this lawsuit, the plaintiff filed charges of discrimination against Circuit with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") within 180 days of the commission of the alleged unlawful employment practices. Before mid-August, 2000, both the MCAD and the EEOC issued notices of the right to sue at which time the plaintiff initiated the instant action.

Pending before this Court is defendant's motion for summary judgment. Circuit denies that it discriminated against Fink, claiming that it terminated him because of performance issues and a good faith belief that he was terminally ill.

## I. *Factual Background*

Circuit manufactures circuit boards for communications, computer and other commercial equipment. On March 29, 1999, Kashgegian, on behalf of Circuit, hired Fink for the functionally "critical" position of Director of Corporate Quality. In that capacity, Fink assumed responsibility for quality control and quality assurance systems at Circuit, managing employees and operations within the unit.

During his first few months at Circuit, Fink asserts that his performance was quite strong. Kashgegian, for example, lauded his leadership skills in directing the company's most successful quality audit in Spring, 1999 in a company newsletter. Indeed, Circuit sent Fink as its representative in meetings to Otis elevator in June, 1999.

Shortly after Fink became Director of Corporate Quality, his health began to deteriorate and he experienced a dramatic weight loss, trembling hands and concentration problems. On August 10, 1999,

internist Dr. Elias Belezos (Dr. Belezos) examined Fink and subsequently referred him to an endocrinologist, Dr. Richard Haas. After some testing, Fink was diagnosed with Grave's Disease, a thyroid disorder.

By the end of the Summer, 1999, the relationship between Fink and Circuit had begun to breakdown. At that time, Fink discussed his thyroid condition with Kashgegian and O'Donnell on numerous occasions. Rather than fostering an atmosphere of accommodation, Fink alleges that Kashgegian and O'Donnell were markedly hostile, placing increased demands upon him.

The defendants respond that Fink never informed them that he had a serious medical problem that would affect his performance. Rather, they contend that Fink appeared to be "embarrassed" by his condition and would downplay his illness. Apart from any health problem, the defendants allege that they had growing concerns about Fink's performance, and in particular, his alleged failure to meet deadlines. The defendants contend that they had to assign some of Fink's responsibilities to other workers.

During his brief tenure at Circuit, Fink admits that his performance was affected by his memory loss but he claims, with the support of his doctors, that his difficulties stemmed from his thyroid condition. Fink contends that there were other managers within the company who were the real cause of any operational problems at Circuit. By implication, he argues that the tension between the parties arose from the staffing and structure of Circuit, situations over which he had no control.

On November 23, 1999, Fink presented to Kashgegian a letter from Dr. Haas dated October 7, 1999 stating that he suffered from Graves' disease. Fink, along with his doctors, consequently sought a temporary accommodation from the defendants for his medical condition. In particular, in order to address his fatigue and insomnia, Fink requested that the defendants alter his daily work schedule so that he could work from 7:00 a.m. to 4:00 p.m. The defendants denied his request.

After Fink notified the defendants of his condition, an ongoing, antagonistic correspondence ensued between the parties. On November 29, 1999, Kashgegian sent a memorandum to Fink questioning his decision to submit a letter from his doctor several weeks late and reiterating Kashgegian's persisting concerns with Fink's job performance. Three weeks later, Fink's written response blamed any deficiencies in his performance on his medical condition.

On December 21 and 22, 1999, Fink informed Circuit that he would not be at work on those days pursuant to his doctor's directive. At that juncture, Kashgegian purportedly sent Fink a memorandum stating that Fink could not return to work until he provided the company with complete medical documentation. A week letter, Fink submitted to Circuit a written note stating that he was being "evaluated for health related issues" and that he was undergoing extensive tests that would require one or two more weeks to complete. On January 8, 2000, Fink forwarded to Circuit another handwritten note from Dr. Belezos advising it that Fink required still more testing.

On January 14, 2000, O'Donnell, by letter, reiterated to Fink that Circuit required medical documentation with respect to particular items from his physicians. Not having received a response, O'Donnell contacted Dr. Belezos directly to inquire about Fink's health status. During that telephone conversation, Dr. Belezos allegedly informed O'Donnell that he was *lean-*

*ing towards* a diagnosis of Alzheimer's disease but, because he had not yet reached a definite diagnosis, O'Donnell should not tell Fink. Dr. Belezos noted that if Fink did, indeed, have Alzheimer's he would be unable to return to work. Although Dr. Belezos promised O'Donnell a written and final diagnosis and O'Donnell contacted him on several occasions in that regard, no such correspondence was forthcoming.

Fink received a written notice from Circuit that his employment was terminated effective March 3, 2000. Unbeknownst to Circuit, on February 17, 2000, Fink's physicians agreed that he could return to work on a part-time basis in mid-March, 2000. A few months later, Fink began a full-time position at Barry Controls as the Director of Quality Assurance Engineering.

## II. *Discussion*

### A. Legal Standard

It is axiomatic that summary judgment is appropriate only if there is no genuine issue of material fact such that a reasonable jury could not find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the entire record in the light most hospitable to the nonmoving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). In that regard, the role of the trial court is not to resolve issues but to glean the record and pleadings for issues that remain to be tried.

### B. The ADA

In 1990, Congress promulgated the ADA to address prejudice against the disabled, including workplace discrimination against qualified individuals with a disability. Under the ADA, an employer must provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship.

42 U.S.C. § 12112(b)(5)(A) (1994 ed.); *see also* 42 U.S.C. § 12111(2).

In order to establish a *prima facie* case of discrimination under the ADA, the plaintiff bears the burden of showing that: 1) he had a disability as provided by the Act, 2) he was a qualified individual able to fulfill the essential functions of the position with or without a reasonable accommodation, and 3) his employer discharged him because of his disability. *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 32–33 (1st Cir.2000); *Criado v. IBM Corp.*, 145 F.3d 437, 441 (1st Cir. 1998).

### 1. Disability Under the ADA

■ Fink contends that his medical condition falls within the purview of the ADA's definition of disability because he has an impairment that substantially limits one or more of his major life activities. Circuit, in response, asserts that the ADA is inapplicable here because not only did Fink represent that his medical condition caused him no problem but also certain statements by Fink's doctors led Circuit to believe that Fink's medical condition was under control.

To supply some context to the parties' positions, the ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (noting that in interpreting the ADA, courts may consider relevant interpretations and regulations of various administrative agencies).

This Court's analysis of whether Fink had a disability under the ADA proceeds in three steps: 1) an assessment of whether plaintiff's thyroid disorder was a physical impairment, 2) an identification of the major life activity at issue and 3) a determination of whether that impairment substantially limited the major life activity.

### a. Physical Impairment

Under the ADA, this Court must first analyze whether Fink's medical condition constitutes a physical impairment. *Bragdon,* 524 U.S. at 631–32, 118 S.Ct. 2196. The Department of Health and Human Services ("HHS") has defined "physical or mental impairment" to be:

A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs... hemic and lymphatic; skin; and *endocrine* ....

45 C.F.R. § 84.3(j)(2)(i) (1997); see also *id.* (describing the relevant legislative history).

The record before this Court with respect to Fink's medical condition is nothing short of a labyrinth of conflicting testimony and convoluted assertions. Fink admits that his doctors provided inconsistent reports to Circuit (when they were provided at all) but he nonetheless asserts that he had a bona fide physical impairment because he suffered from Graves' disease. For the purpose of this motion, this Court will necessarily infer that Fink had Graves' disease or a comparable thyroid disorder.

Because of Graves' disease, Fink allegedly experienced fatigue, memory loss and lack of muscle control. Fink's bouts with fatigue and his complaints of shaky hands suggest, for the purpose of this motion, that he may have a physical impairment under the ADA. To the extent that there remains any lingering doubt, Graves' disease meets the HHS definition of physical impairment; it is a disorder of the thyroid, an endocrine gland. Indeed, other courts presented with the identical issue have held that Graves' disease constitutes a disability within the meaning of the ADA. *Harris v. H & W Contracting Co.,* 102 F.3d 516, 520 (11th Cir.1996); *Bonitch v. The Original Honey Baked Ham Co. of the East, Inc.,* 34 F.Supp.2d 154, 158 (E.D.N.Y.1999). Plaintiff has, therefore, proffered sufficient evidence to suggest that Graves' disease is a physical impairment under the ADA.

### b. Major life activity

The ADA is "not operative, and the definition not satisfied, unless the impairment affects a major life activity." *Bragdon,* 524 U.S. at 636, 118 S.Ct. 2196. Because of his thyroid disorder, the plaintiff states that he suffered from fatigue, concentration problems and memory loss. Thinking, sleeping, concentrating and learning may constitute major life activities. *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 307 (3rd Cir.1999); *Mulholland v. Pharmacia & Upjohn, Inc.,* 2001 WL 311241, *4 (W.D.Mich.2001)(collecting cases). The plaintiff has demonstrated, for the purpose of this motion, that his disorder affected a major life activity.

### c. Substantial Limitation

Finally, Fink must show that his physical impairment posed a substantial limitation on a major life activity. The EEOC regulations interpreting the ADA provide

guidance and identify several factors that determine whether a disability substantially limits a major life activity:

(i) the nature and severity of the impairment;

(ii) the duration or expected duration of the impairment; and

(iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

The effect of medication is not relevant to this Court's determination. *Bonitch*, 34 F.Supp.2d at 159 (collecting cases).

Plaintiff has offered minimal evidence that his illness substantially limited his ability to sleep and think. Whether a physical impairment constitutes a substantial limitation is often fact-dependent and not readily disposed of at the summary judgment stage. *See School Bd. v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Other Courts have noted, for example, that whether a person afflicted with Graves' disease "has an impairment which substantially limits a major life activity is a genuine issue of material fact [for the] jury". *Bonitch*, 34 F.Supp.2d at 159.

### 2. Qualified Individual Under the ADA

As its next ground for attack, the defendants argue that there is inadequate evidence demonstrating that the plaintiff was a qualified individual within the meaning of the ADA. The plaintiff bears the burden of demonstrating that he

possess[es] the requisite skill experience, education and other job-related requirements for the position, and second, [that he is] able to perform the essential functions of the position with or without reasonable accommodation.

*Criado*, 145 F.3d at 443 (quoting 29 C.F.R. § 1630.2(m)).

As in a recent First Circuit case, the present "inquiry is somewhat complicated by the interrelationship between the terms essential function and reasonable accommodation." *Ward*, 209 F.3d at 33. For the sake of clarity, however, courts consider an employee's qualified status in two inter-dependent steps: whether the plaintiff could perform the essential functions of his position and, if not, whether a reasonable accommodation would enable him to do so. *Id.*

#### a. Essential Functions

With over 15 years experience in quality control management systems, the record is clear that Fink had the requisite experience for the position of Director of Corporate Quality at Circuit. The defendants contend, nonetheless, that Fink was unable to perform the essential functions of his job with or without a reasonable accommodation.

From the outset, the defendants assert that Fink had difficulties in a position that was critical to the operational success of the company. As Director of Corporate Quality, Fink was responsible for ensuring that the circuit boards manufactured by the company met critical quality benchmarks and, in turn, that customers received a superior product.

Because of Fink's memory problems, the defendants presumed that his medical condition precluded him from working at Circuit altogether. There was some basis for defendants' belief: the short term disability application submitted by Dr. Belezos opined that Fink suffered from "memory loss" and "severe limitation of functional capacity." Moreover, the defendants inferred, based upon conversations with Dr. Belezos, that Fink had Alzheimer's Dis-

ease, a condition which certainly would prevent Fink from continuing to work at Circuit.

Fink responds that Circuit initially praised his work and that many of his performance problems had nothing to do with his illness but rather with its other managers. Although he does not deny that he had memory and concentration troubles, he contends, with the alleged support of his doctors, that those performance issues were due to his thyroid disorder, a condition for which he was seeking treatment.

Despite the defendants' suggestions to the contrary, there is no conclusive evidence that Fink's memory problems were beyond treatment or that he was unable to perform the essential functions of his job. The defendants, at the time they made their decision to terminate Fink, could not say with certainty that Fink was not a qualified individual under the ADA. They had received no definite diagnosis of Alzheimer's Disease from Dr. Belezos but rather relied upon his confidential advice that Alzheimer's Disease was a *potential* diagnosis.

In fact, on January 21, 2000, Dr. Belezos gave Fink a clean bill of health and informed him that he could soon return to work on a part-time basis. As surmised from the record, it is apparently Fink's position that he could and can perform the essential functions of his job but that he required medical leave while he was being diagnosed and treated by his physicians.

### b. Reasonable Accommodation

■ The determination of whether a reasonable accommodation would enable an employee to perform the essential functions of his job turns upon the precise facts of the case. *Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 647 (1st Cir. 2000). Once the plaintiff satisfies his bur-

den of demonstrating the existence of a reasonable accommodation, the defendant must show that an accommodation would pose an undue hardship. *Feliciano v. State of Rhode Island*, 160 F.3d 780, 786 (1st Cir.1998).

### (1) The Request for Accommodation

The defendants contend that, even assuming *arguendo* that Fink was disabled and a qualified individual, he neither requested a reasonable accommodation nor engaged in an interactive process by providing them with sufficient information. Under the defendants' version of events, they had no obligation to accommodate the plaintiff because he failed to fulfill his end of the bargain to provide them with necessary documentation.

Although the defendants' contentions have appeal, the ADA does not operate under the *quid pro quo* norm embedded in contract law. The employer, unlike the employee, is a regular player and may have more information at its disposal about the possible accommodations available. The question before this Court is, therefore, whether Fink provided sufficient information to Circuit so as to prompt its legal obligation to accommodate him.

Predictably, Fink contends that, notwithstanding his lack of formality, he provided sufficient information to Circuit, including numerous informal discussions with Kashgegian and O'Donnell in August and September, 1999, about his medical condition. Moreover, he suggests that rather than promoting an "interactive" discourse, the defendants were hostile. By way of example, Fink points out that he, along with his doctors, made a reasonable request for modified hours in the Fall, 1999 but that his request was denied.

Fink suggests further that he was directed by the defendants not to return to

work until he had a definite diagnosis backed by adequate documentation, creating the knotty question of whether the defendants initiated his leave in the first instance. To be sure, the defendants attempted on numerous occasions to obtain a firm medical diagnosis from Dr. Belezos, the absence of which is blamed (by Fink) on Belezos' long vacation in February and March, 2000.

Confronted with an intense factual dispute, this Court need not allocate responsibility among the parties. There is a genuine issue of material fact as to whether the defendants required a definite diagnosis before their duty to accommodate Fink was prompted.

### (2) The Reasonableness of the Accommodation

This Court must next consider whether Fink's requested accommodation, a modified work schedule and temporary medical leave, falls within the ambit of a reasonable accommodation. As the First Circuit Court of Appeals has recognized, "a reasonable accommodation may include job restructuring, part-time or modified work schedules, and other similar accommodations." *Criado*, 145 F.3d at 441 (quoting.§ 12111(9)(B)).

Depending upon the facts of the case, a modified schedule need not be regular or predictable. *Ward*, 209 F.3d at 36. Before December 2000, Fink requested a schedule that would have allowed him to arrive and leave earlier, which his physicians allegedly believed would redress his insomnia and fatigue problems at work. The defendants do not contend that Fink's proposed schedule would have rendered him unable to perform the essential functions of his job and, for the purpose of this motion, this Court need not determine the merit or feasibility of his requested accommodation.

Fink's alleged medical leave of absence presents this Court with a more nettlesome legal and factual question. It is uncontroverted that Fink took time off from work commencing in late December, 1999 so that his doctors could develop an effective treatment plan. It is less than clear from the record, however, whether Fink's absence was a medical leave or a requested accommodation because Fink failed to give Circuit any notification.

Starting with the required presumption that Fink's absence was equivalent to a medical leave, there were multiple communication failures by both parties. The issue before this Court is, therefore, whether Circuit must accommodate an unspecified but ostensibly temporary medical leave. Under certain circumstances, "[a] leave of absence and leave extensions are reasonable accommodations..." *Criado*, 145 F.3d at 443. An employee on medical leave need not always provide an employer with a definite time frame for his absence but there certainly might be a requested leave that is so open-ended as to require an unreasonable accommodation under any circumstances. *Garcia–Ayala*, 212 F.3d at 648.

The instant case certainly approaches such an open-ended time frame. The record suggests that, although Fink's physician diagnosed and treated him, neither Fink nor Circuit knew how long he would be out on leave. Moreover, Circuit never received a formal diagnosis from Dr. Belezos.

Fink, for his part, contends that while Dr. Belezos was incommunicado for over a month, his diagnosis was eventually forthcoming and informative, i.e., by February, 2000 Dr. Belezos had determined that Fink could return to work the following month on a part-time basis. It is not clear whether requiring an employer to wait for

a diagnosis falls outside the ambit of a reasonable accommodation. At this point in the litigation, however, this Court cannot conclude that the plaintiff sought a *per se* unreasonable accommodation.

### (3) Undue Hardship

■ Defendants further deny liability on the ground that the accommodation sought would pose an undue hardship on their business. Under the ADA, the employer bears no liability if it shows that the requested accommodation would pose an undue hardship. 42 U.S.C. § 12112(b)(5)(A). At the same time, however, pursuant to the ADA, employers "must modify some work rules, facilities, terms, or conditions to enable a disabled person to work". *Ward,* 209 F.3d at 37. Circuit must, therefore, submit evidence tending to show that the requested accommodation would present "significant difficulty or expense". *Id.,* at 36 (quoting 29 C.F.R. § 1630.2(p)(1)).

In the instant case, Circuit alleges that Fink held a key management position not readily filled on a temporary basis. Kashgegian consequently had to assume Fink's duties while he was on leave and restructure the Quality Control Department accordingly. Fink contends, however, that 1) Kashgegian had assumed a hands-on approach to the Department before his departure from Circuit, 2) many other qualified individuals were involved in the quality certification process and, as a consequence, 3) Circuit would not have suffered any undue hardship.

As the contested arguments of the parties suggest, a genuine issue of material fact remains to be tried with respect to whether Circuit would face an undue hardship because of the requested accommodation.

### 3. Whether Fink Was Discharged Because of His Disability

■ The defendants contend that they terminated Fink because of his deficient performance rather than his medical problem. Pursuant to the ADA, an employer is liable only if it discharges an employee because of his disability. An employer violates no law by terminating an employee for failure to perform his job, whether or not the employee is disabled. *Ward,* 209 F.3d at 37. In justifying the decision to terminate Fink, the defendants assert that not only did Fink appear unable to fulfill his role as Director of Corporate Quality, Graves' but also they believed, in good faith, that he had Alzheimer's Disease and was unable to return to work.

There remains, however, another factual question of whether Fink's thyroid disorder was responsible for his performance problems at work, including his fatigue and memory loss. Fink requested a modified work schedule and later took a medical leave to address his disability. To that end, the plaintiff's request for an accommodation and the defendants' reasons for termination may be two sides of the same coin.

In cases where the reasonable accommodation sought would address the problem that led to the employee's termination, courts have found that there is a genuine issue of material fact as to whether the employee was terminated because of his disability. *See, e.g., Criado,* 145 F.3d at 444–45; *Ward,* 209 F.3d at 37–38; *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285–86 (7th Cir.1996) (noting that, under the circumstances, the employer should have reconsidered its decision to terminate disabled employee even though physician's letter seeking an accommodation came after that decision). There is such a genuine issue here.

## C. Individual Liability Under the ADA

The defendants contend that the ADA claims against Kashgegian and O'Donnell are barred on the ground that there is no individual liability under the ADA. Neither the Supreme Court nor the First Circuit Court of Appeals has decided the issue but the growing weight of authority is that there is no individual liability under the ADA. *See, e.g. Lemire v. Silva,* 104 F.Supp.2d 80 (D.Mass.2000); *Meara v. Bennett,* 27 F.Supp.2d 288, 290 (D.Mass.1998); *Butler v. City of Prairie Village, Kansas,* 172 F.3d 736, 744 (10th Cir.1999); *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1279–82 (7th Cir.1995). The ADA itself further illuminates the issue: its definition of employer extends to agents so as "to ensure employer liability, and reject individual liability." *Lemire,* 104 F.Supp.2d at 92. Therefore, this Court will allow defendants' motion for summary judgment with respect to plaintiff's discrimination claims against Kashgegian and O'Donnell.

## D. Chapter 151B

Pursuant to M.G.L. c. 151B, a plaintiff must file a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") within 180 days of the discriminatory conduct, naming in that charge the parties alleged to be responsible. M.G.L. c. 151B § 5; 804 CMR 1.03(4), (a). A complainant who omits a party in a MCAD charge may be precluded from later asserting a Chapter 151B claim in court against that party. *Chatman v. Gentle Dental Ctr. of Waltham,* 973 F.Supp. 228, 233 (D.Mass.1997). The requirement that an employee first file a charge with the MCAD "provide[s] the employer with prompt notice of the claim and ... create[s] an opportunity for early conciliation." *Id.* (quoting *Lattimore*

*v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996)).

The clear weight of authority holds, however, that the failure to name a party in an administrative charge of discrimination need not preclude a subsequent lawsuit against the party if that charge, read as a whole, gave the party notice of the alleged discriminatory conduct and an opportunity to participate in the MCAD proceeding. *See, e.g., id.; McKinnon v. Kwong Wah Restaurant,* 83 F.3d 498, 504–5 (1st Cir.1996); *Kuketz v. MDC Fitness Corp.,* 1998 WL 1119863 (Mass.Super.1998).

The plaintiff failed to name the individual defendants in his MCAD Charge against Circuit. Although Fink did not even mention the individual defendants in his charge form, he claims that both Kashgegian and O'Donnell took part in the MCAD proceeding by producing documents and participating in the pleadings.

Based upon the pleadings before this Court, it is not clear if the individual defendants had notice of and an opportunity to "conciliate" the charges against them in the MCAD proceeding. *Chatman,* 973 F.Supp. at 236. Because the complaint does not allege that the individual defendants had such notice and opportunity, the Chapter 151B claims will be dismissed without prejudice.

## E. Section 1981a

An ADA plaintiff may recover *compensatory and punitive* damages in cases of "intentional discrimination". 42 U.S.C. § 1981a(a)(1). To be sure, there are cases in which an employer may make decisions based upon the employee's handicap without violating the ADA. *Cf. Hazen Paper Co. v. Biggins,* 507 U.S. 604, 616, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). If the plaintiff did, indeed, have Alzheimer's

Disease, the defendants would not be liable pursuant to the ADA for their decision to terminate his employment because no reasonable accommodation would have been possible. Here, the defendants had no conclusive evidence that Fink had Alzheimer's Disease. In fact, they were unaware of why he was sick or when he would return to work, if at all.

Under these circumstances, although it is clear that the plaintiff would not be entitled to punitive damages, the issue of compensatory damages is a much closer call. Given that ambiguity, summary judgment is inappropriate with respect to the plaintiff's Section 1981a claim.

### III. *Conclusion*

Although his pleadings are barely intelligible and his proffer of evidence quite weak, the plaintiff in the instant case has offered just enough evidence to create a genuine issue of material fact as to whether or not he has an actionable claim under the ADA, Chapter 151B and Section 1981a with respect to Circuit. On the other hand, defendants' summary judgment motion with respect to plaintiff's claims against Kashgegian and O'Donnell under the ADA and Chapter 151B will be ALLOWED. Finally, pursuant to the plaintiff's request in responsive pleadings, his claims for age discrimination and intentional infliction of emotional distress will be DISMISSED.

### ORDER

For the reasons set forth in the Memorandum above, defendants' motion for summary judgment (Docket No. 4) is:

1) with respect to the defendant Printed Circuit Corporation under Counts I, II and III, DENIED; and

2) with respect to defendants Glen Kashgegian and Michelle O'Donnell under Counts I and II, ALLOWED,

and under Count III, ALLOWED without prejudice.

Pursuant to the plaintiff's request, Count IV and all claims for age discrimination are DISMISSED.

So ordered.