SEAN MITCHELL BARRON *vs.* FIDELITY MAGELLAN FUND
& others.[1]

No. 00-P-66.

Suffolk. February 13, 2002. - March 5, 2003.

Present: RAPOZA, DREBEN, & MILLS, JJ.[2]

*Consumer Protection Act,* Securities transactions, Damages, Attorney's fees. *Statute,* Construction. *Practice, Civil,* Summary judgment. *Witness,* Expert.

This court concluded that G. L. c. 93A, § 9(3), as amended by St. 1987, c. 664, § 3, which limits recovery to actual (i.e., not multiple) damages in consumer protection cases involving "any security," did not operate to preclude an award of attorney's fees or costs otherwise available under G. L. c. 93A, § 9(4), to a prevailing party in a case involving unfair and deceptive acts and practices regarding a security. [511-518]

A defendant in a civil action was entitled to bring a second motion for summary judgment that was grounded in a wholly new issue not raised or decided in a previous motion for summary judgment. [518-519]

There was no merit to a plaintiff's contentions in a civil action that the allowance of a motion for summary judgment prevented him from receiving a formal accounting [519], or that the allowance of a motion in limine excluding the testimony of his expert prevented him from showing that genuine issues of material fact remained in dispute [519-521].

CIVIL ACTION commenced in the Superior Court Department on October 2, 1995.

The case was heard by *Martha B. Sosman,* J., on a motion for summary judgment.

*Colette Manoil* for the plaintiff.

*David C. Boch* for the defendants.

RAPOZA, J. The primary issue before us is whether, in the circumstances of this case, the plaintiff, Sean Mitchell Barron (Sean), can recover multiple damages and attorney's fees from

---

[1]Fidelity Service Co., Fidelity Investments, and FMR Corp.

[2]Following oral argument, Dreben, J., was substituted for Cypher, J., on the panel.

the defendants (collectively, Fidelity) pursuant to G. L. c. 93A, § 9. A judge of the Superior Court concluded that he could not, citing G. L. c. 93A, § 9(3), as amended through St. 1987, c. 664, § 3, which limits recovery to actual damages in cases involving "any security." As Sean's c. 93A claim relates to Fidelity's handling of his mutual fund account, the judge concluded that the limitation applies and allowed the defendants' pretrial motion to restrict Sean's claim to his actual damages and to deny him the recovery of attorney's fees. Thereafter, having concluded that Sean could not prove his damages in excess of the amount already paid to him by the defendants and the Commonwealth, the judge allowed the defendants' motion for summary judgment. This appeal followed.

*Background.* Starting in 1961, both Maurice Barron (Maurice) and his then wife, Rebecca, began investing in various mutual funds in the Fidelity Group. In 1965, Maurice purchased fifty shares of the Fidelity Magellan Fund under the Uniform Gifts to Minors Act (UGMA) for the benefit of his infant son, Sean. At a point, Maurice instructed Fidelity to reinvest, on a continuing basis, any dividends and capital gain distributions in additional shares of the Magellan Fund. As a result, the number of shares in Sean's Magellan UGMA account increased over time.

In 1969, the Barron family moved from one house to another in the town of Randolph and provided their new address to Fidelity. Although the Barrons, including Maurice, continued to receive periodic statements from Fidelity with respect to several of their accounts, at some point Maurice, unbeknownst to him, stopped receiving statements concerning the mutual fund account that he had opened for Sean.[3]

In 1981, Fidelity deemed Sean's UGMA account to be abandoned, and reported the account to the unclaimed property division of the Department of the State Treasurer pursuant to G. L. c. 200A, § 7, the abandoned property statute. On February 9, 1982, Fidelity transferred the 783.508 shares then in

---

[3]Apparently, Fidelity continued to mail Sean's account statements to the old address for a period of time, and subsequently terminated the mailings altogether after they were routinely returned as undeliverable by the United States Postal Service.

Sean's account to the Commonwealth, as provided in G. L. c. 200A, § 8A. Thereafter, the shares continued to earn dividends, which were reinvested, along with distributions, to purchase additional shares. When no one claimed the shares, which ultimately reached 1,518.48 in number, the Treasurer liquidated them on May 23, 1988. See G. L. c. 200A, § 9.

In early 1994, Sean, then twenty-eight years old, was contacted by a private investigator who asked if he wished to retain her for the purpose of recovering his abandoned property. Sean declined and called Fidelity directly, requesting that the company reinstate his Magellan account. Fidelity refused.

Sean then filed a claim with the Treasurer's division of unclaimed property for the value of his shares as of the date of their liquidation. The Treasurer subsequently issued three checks to Sean, totaling $104,613.65. Sean and his father were not satisfied with the amount paid by the Commonwealth, and they filed an action in Superior Court against several entities associated with Fidelity, as well as against Joseph Malone, the Treasurer and Receiver General of the Commonwealth.[4] In their complaint, the Barrons requested an accounting and asserted claims not only under c. 93A, but also for negligence, breach of fiduciary duty, and breach of contract.

On November 4, 1997, over two years after suit was filed, Fidelity issued a check in the amount of $152,379.30 to the Barrons, asserting that the amount of the check, combined with the sums previously paid by the Commonwealth, equaled the value of Sean's account as of October 20, 1997.[5] The total amount received by the Barrons from both the Commonwealth and Fidelity thus came to $256,992.95.

Shortly before the scheduled trial date, Fidelity filed a "Motion for Pretrial Ruling Regarding Plaintiff's Chapter 93A Count" to determine the scope of recovery available to the Barrons in a case relating to "any security." G. L. c. 93A,

---

[4]Joseph Malone is no longer a party to the action, summary judgment having entered in his favor on grounds unrelated to this appeal.

[5]In ruling on Fidelity's motion for summary judgment, the judge found, consistent with the "Stipulation and Order" filed by Fidelity, that "tender [of the $152,379.30] was without reservation, subject only to Fidelity's right to set off the amount paid in the event that the Barrons were ever awarded any higher figure."

§ 9(3). In its motion, Fidelity essentially asked the court to rule that the Barrons were not entitled to recover either multiple damages or attorney's fees. In support of its claim, Fidelity cited G. L. c. 93A, § 9(3), as in effect on April 4, 1988,[6] which provides that "recovery shall be in the amount of actual damages" in cases where any method, act or practice is adjudged "unlawful with regard to any security."

The motion was allowed by a Superior Court judge, who concluded that since the case was one relating to securities, the limitation on recovery contained in G. L. c. 93A, § 9(3), applied and barred any claim for either multiple damages or attorney's fees.[7] As Fidelity had previously conceded liability on the Barrons' c. 93A claim contingent on the judge's ruling that recovery was limited to actual damages, this left only the issue of the extent of those damages for trial.[8]

Fidelity subsequently filed two additional motions: first, a motion in limine seeking to exclude any evidence from the Barrons' expert concerning the valuation of the shares in Sean's mutual fund account and, second, a motion for summary judgment claiming that, without the testimony of their expert, the Barrons could not demonstrate that they were owed anything more than the combined amount already paid to them by Fidelity and the Commonwealth. The motion in limine was allowed, and any evidence from the Barrons' expert was excluded based upon the plaintiffs' failure adequately to answer Fidelity's interrogatories and, later, to supplement the answers they did provide. See Mass.R.Civ.P. 26(e)(1), 365 Mass. 772 (1974).

Although the judge ruled that the Barrons were precluded from presenting expert testimony at trial, she nonetheless

---

[6]See note 12 and related text, *infra.*

[7]Although the judge made no written findings or rulings on this issue, she articulated the basis for her ruling on the record.

[8]Fidelity stipulated, without condition, that it is liable to the Barrons on Counts I (accounting), III (negligence), IV (breach of fiduciary duty), and V (breach of contract). Fidelity also stipulated as to liability on Count II (violation of c. 93A) on the condition that its stipulation could be withdrawn if, on appeal, the judge's decision denying the "plaintiffs' right to multiple damages is reversed, modified or set aside." The judge accepted Fidelity's stipulation on those terms, apparently without objection from the Barrons. Nothing in this opinion disturbs in any way the decision of the motion judge denying the Barrons' claim to multiple damages.

considered the affidavit of the Barrons' expert when she ruled on the summary judgment motion. From that affidavit, the judge determined that the Barrons' expert had accepted and used Fidelity's methodology in computing the value of the shares. The only difference between the calculations submitted by Fidelity and those computed by the Barrons' expert was the starting number of shares, with Fidelity asserting that it transferred 783.508 shares to the Commonwealth, and the Barrons claiming the number should have been 1,179.142. The judge, in turn, concluded that the Barrons had no competent evidence to support the starting number used by their expert. Consequently, she deduced, there was no basis upon which the Barrons could prove actual damages in excess of the $256,992.95 that they had already received from Fidelity and the Commonwealth. Accordingly, the judge ruled that there were no disputed issues of material fact left to be resolved at trial. Fidelity's motion for summary judgment was thus allowed, and Sean appealed.[9]

*Discussion*

A. *General Laws c. 93A.* Sean alleges that Fidelity committed an unfair and deceptive act or practice when it failed to maintain adequate records of him as a customer and shareholder to the point where it erroneously concluded that he had abandoned his account.[10] As a result, his shares were wrongly surrendered to the Commonwealth and, ultimately, liquidated. Necessarily, at that point, Fidelity stopped purchasing additional shares on his behalf, and, for all practical purposes, his account ceased to exist. The issue presented here is whether G. L. c. 93A, § 9(3), as amended to include matters involving "any security," applies in these circumstances.[11]

---

[9]Sean is the only plaintiff in this appeal, Maurice having been previously dismissed from the action by stipulation.

[10]In addition to Fidelity's apparent missteps with regard to the Barrons' address change, the plaintiffs claimed that Fidelity easily could have located Sean by cross-referencing the Barrons' other accounts, all of which carried Maurice's name, correct family address and a letter code common to all Barron family accounts, including Sean's UGMA account.

[11]Before the motion judge, the Barrons asserted that c. 93A applied to their claim because the unfair and deceptive acts or practices of Fidelity involved

Chapter 93A was enacted in 1967 for the purpose of protecting consumers from unfair and deceptive acts and practices in the conduct of any "trade or commerce." See G. L. c. 93A, § 2(*a*). Although covering a broad spectrum of business activities, the original statutory definition of "trade" and "commerce" did not refer to any matter involving securities. "In the case of securities transactions . . . the Legislature did not intend c. 93A to regulate the field." *Cabot Corp.* v. *Baddour*, 394 Mass. 720, 723 (1985).

It was not until 1988 that the statute was amended to apply to circumstances involving "any security."[12] In that year, "An Act Providing Increased Protection for Consumers in Securities and Commodities Transactions" was enacted, amending the definition of "trade" and "commerce," as used in G. L. c. 93A, § 2(*a*), to include the term "any security." St. 1987, c. 664,

the rendering of "any services" in the course of "trade" or "commerce." G. L. c. 93A, § 1(*b*). That the "services" related to "any security" was, they argued, inconsequential to the application of the statute. On appeal, however, Sean does not contest the basis on which the judge ruled that the case comes under c. 93A, but rather restricts his argument to the applicability of the provision in § 9(3) that limits claims to actual damages in cases involving "any security." See note 17, *infra*. Considering that no reported case has yet applied c. 93A to a matter involving "any security," we review the basis for applying the statute in this case.

[12]Absent an express or implied legislative intent to the contrary, a statutory amendment that affects substantive rights, as is the case here, is to be applied prospectively. See *Goldstein Oil Co.* v. *C.K. Smith Co.*, 20 Mass. App. Ct. 243, 250-251 (1985); *Shamsi* v. *Dean Witter Reynolds, Inc.*, 743 F. Supp. 87, 93 (D. Mass. 1989); *Alton* v. *Prudential-Bache Sec., Inc.*, 753 F. Supp. 39, 42 (D. Mass. 1990) (1988 amendment to c. 93A applying to securities has only prospective effect). See also *Smith* v. *Caggiano*, 12 Mass. App. Ct. 41, 43 (1981). Both parties have treated the 1988 version of G. L. c. 93A as applying to the present action, although the only significant event occurring after the amendment of the statute was the Commonwealth's liquidation of the escheated shares on May 23, 1988. Indeed, the conduct on the part of Fidelity that forms the basis of the Barrons' c. 93A claim culminated in February, 1982, when Fidelity transferred the shares in Sean's Magellan UGMA account to the State Treasury. If, based on that allegation, we were to conclude that the pre-amendment version of c. 93A applied, the Barrons would be unable to make a claim under the statute which, prior to amendment, made no provision for a case involving securities. See *Cabot Corp.* v. *Baddour*, 394 Mass. at 723. Where both parties have proceeded as if c. 93A, as amended in 1988, is the operative statute here, we do so as well, solely for the purpose of this appeal.

§ 3.[13] Following the amendment, "trade" and "commerce" are now defined to include the "advertising . . . offering for sale . . . the sale . . . or distribution of . . . any security." G. L. c. 93A, § 1(*b*). This expansion of the definition of "trade" and "commerce" permitted consumers initiating an action on their own behalf under G. L. c. 93A, § 9,[14] to assert, for the first time, claims that they could not previously have brought under the statute.[15]

The shares of the Fidelity Magellan Fund at issue here are securities within the meaning of G. L. c. 93A, § 1(*b*). See G. L. c. 110A, § 401(*k*) (term "security" includes any "stock" or "transferable share"). Indeed, Fidelity sold shares in its Magellan Fund directly to the public as well as to its pre-existing customers, such as the Barrons, who purchased additional shares by means of the automatic reinvestment of their dividends and capital gains distributions. The shares in Sean's account, and the manner in which they were purchased, administered, maintained, valued, transferred, and disposed of, are at the heart of the c. 93A claim against Fidelity. Thus, Sean's complaint relates to activities on the part of Fidelity that arise in the conduct of any trade or commerce as those terms are now defined in G. L. c. 93A, § 1(*b*). Accordingly, the acts and

[13]General Laws c. 93A, § 1(*b*), states that the meaning of the word "security" is to be found in G. L. c. 110A, § 401(*k*); where that term is defined to include any "stock" or "transferable share."

[14]An action under G. L. c. 93A, § 9, may be brought by an individual "who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two." Section 2, in turn, states, in pertinent part, that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." As already noted, "trade" and "commerce" are defined to include certain activities relating to "any security." G. L. c. 93A, § 1(*b*), as amended.

[15]Statute 1987, c. 664, § 3, also amended G. L. c. 93A, § 4, which provides that, in any action brought by the Attorney General under the statute, the court may "restore any person who has suffered any ascertainable loss" as the result of an unlawful method, act or practice employed "with regard to any security." Under § 4, recovery in cases involving securities is not limited to actual damages, but may be ordered in an amount of "up to three but not less than two times" the amount of the loss, so long as the act or practice regarding a security constitutes a "[wilful] violation" of the statute. In the event of such a wilful violation, civil penalties, reasonable costs of investigation and litigation, as well as reasonable attorney's fees, can be awarded. *Ibid.*

practices complained of by the Barrons are actionable under G. L. c. 93A, § 9, as amended.

Although the Legislature extended the reach of private actions by consumers to include matters involving securities, it also amended G. L. c. 93A, § 9(3), to limit the scope of recovery in such cases to actual damages.[16] As modified, the statute now provides that "[n]otwithstanding any other provision to the contrary, if the court finds any method, act or practice unlawful *with regard to any security* . . . recovery shall be in the amount of actual damages" (emphasis supplied). Consequently, the judge correctly limited the plaintiffs' c. 93A claim to actual damages where the underlying action was "with regard to any security."[17]

The judge erred, however, when she also ruled that the statutory provision limiting recovery to actual damages precludes an award of attorney's fees.[18] Referring to the language of G. L. c. 93A, § 9(3), which states that "recovery shall be in the amount of actual damages," she concluded that not only multiple damages, but also attorney's fees, are unavailable to the plaintiffs. Such a literal reading of the quoted phrase, however, ignores the statutory context in which the words of limitation appear.

The extent to which damages and equitable relief are avail-

---

[16]The statute is somewhat anomalous in this regard. By amending the definition of "trade" and "commerce" in G. L. c. 93A, § 1(*b*), to include matters involving "any security," it necessarily expands the circumstances in which a case can be brought, not only under G. L. c. 93A, § 9, but also pursuant to G. L. c. 93A, § 11. Nonetheless, the amendment limits recovery to actual damages only in the case of private actions brought under § 9 and not as to actions brought pursuant to § 11 by persons engaged in business.

[17]Without reference to any specific provision in G. L. c. 93A or to any other authority, Sean argues that the limitation in § 9(3) applies only where a legal remedy exists under State or Federal law regarding securities. Consequently, he contends, since those State and Federal laws do not reach Fidelity's mismanagement of his account, he has no alternative remedy and is thus entitled to multiple damages despite the restrictive language of § 9(3). However innovative this approach may be, it finds no support in the law. It would require action by the Legislature, and not by us, to extend such a rule to a matter involving "any security" under c. 93A.

[18]Neither the judge below nor the parties on appeal address the issue of costs. We do so, however, mindful that "the same analysis applies to the award of costs" *as to the* award of attorney's fees under G. L. c. 93A, § 9(4). *Tarpey* v. *Crescent Ridge Dairy, Inc.*, 47 Mass. App. Ct. 380, 392 (1999).

able in circumstances where the plaintiff has prevailed is set out in § 9(3). Attorney's fees and costs, on the other hand, are treated separately in G. L. c. 93A, § 9(4). Reading these two sections in tandem, we conclude that, although the restrictive language contained in § 9(3) limits recovery to actual damages in a matter involving securities, it does not preclude an award of either attorney's fees or costs otherwise available pursuant to § 9(4).

At the beginning of § 9(3), the statute describes the extent of recovery available in those cases where damages have not been capped by the presentation of a reasonable written tender in response to a statutory demand letter: "In all other cases, if the court finds for the petitioner, *recovery shall be in the amount of actual damages . . .* or up to three but not less than two times such amount [in cases involving a willful or knowing violation of the statute]" (emphasis supplied). Later in § 9(3), the same language appears, limiting recovery to single damages in cases involving securities: "Notwithstanding any other provision to the contrary, if the court finds any method, act or practice unlawful with regard to any security . . . and if the court finds for the petitioner, *recovery shall be in the amount of actual damages*" (emphasis supplied).[19] No provision is made for the multiplication of damages in cases involving securities.

It is significant that the same language ("recovery shall be in the amount of actual damages") is used in two locations within the same paragraph, because "[w]here words in a statute are used in one part of a statute in a definite sense, they should be given the same meaning in another part of the statute." *Hallett* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 66, 69 (2000). As first used in § 9(3), the words "recovery shall be in the amount of actual damages" in no way suggest that the award of

---

[19]Fidelity contends that the reference to recovery being in the amount of actual damages "[n]otwithstanding any other provision to the contrary" indicates that attorney's fees cannot be awarded even to a successful plaintiff. We read the statute differently. While § 9(3) allows only for actual damages, the phrase in issue ("[n]otwithstanding any other provision to the contrary") merely asserts that the restriction on damages trumps any provision in the statute that would lead to a contrary result, that is, the doubling or trebling of damages. We do not conclude, therefore, that the phrase precludes the award of attorney's fees, since the award of such fees is a separate form of relief from that of damages and, accordingly, is not "contrary" to it. See *infra*.

such damages precludes the allowance of attorney's fees or costs. It could hardly do so, since it is this provision upon which all claims for damages under G. L. c. 93A, § 9(3), are based, claims that are routinely joined with requests for the allowance of attorney's fees and costs pursuant to the next part of the statute, G. L. c. 93A, § 9(4). See, e.g., *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 627-631 (1978); *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 194 (1990); *Hanner* v. *Classic Auto Body, Inc.*, 10 Mass. App. Ct. 121, 123-124 (1980).

Section 9(4), in turn, explicitly provides that "[i]f the court finds *in any action commenced hereunder* that there has been a violation of section two, the petitioner shall, *in addition to other relief provided for by this section* . . . be awarded reasonable attorney's fees and costs" (emphasis supplied). The language of the statute is plain: attorney's fees and costs shall be awarded in "any action" brought under § 9 and are to be considered "in addition" to any other relief. It is thus "the unambiguous language of the statute[] [that] attorney's fees may be recoverable if they were incurred in connection with an action commenced under c. 93A, § 9." *Schultz* v. *Subaru of America, Inc.*, 407 Mass. 1004, 1005 (1990). Sections 9(3) and 9(4) are thus easily harmonized: while § 9(3) precludes the multiplication of damages in matters regarding "any security," that limitation does not prevent a prevailing party in cases involving unfair and deceptive acts and practices[20] from being awarded reasonable attorney's fees and costs under § 9(4).

The language of G. L. c. 93A, § 9(4), authorizing the award of attorney's fees and costs, also appears in G. L. c. 93A, § 11, which relates to actions brought by persons engaged in business. With respect to claims brought under § 11, it has been held that attorney's fees may be awarded even though a plaintiff's recovery was limited to actual damages. See *Linthicum* v. *Archambault*, 379 Mass. 381, 388 (1979) (where plaintiff's c. 93A, § 11, claim was duplicative of her breach of warranty claim,

---

[20]Section 9(4) requires, as a prerequisite to the award of attorney's fees and costs, that the court find a violation of § 2 ("Unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful"). Where Fidelity has admitted to liability under c. 93A, it has effectively acknowledged a violation of § 2.

and in the absence of wilful, intentional, and deliberate conduct, recovery limited to actual damages, combined with attorney's fees and costs). See also *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 379 n.10 (1990) ("Chapter 93A[, § 11,] authorizes the award of attorneys' fees as well as actual damages"). As the words used in § 9(4) relative to counsel fees and costs are identical to those employed in § 11, they should be given the same meaning, with such fees and costs being available under both sections of the statute, even in circumstances where a plaintiff's recovery is limited to actual damages.

Our conclusion that the limitation on damages in § 9(3) does not prohibit recovery of the plaintiff's counsel fees and costs under § 9(4) is reinforced by the fact that attorney's fees constitute a separate form of relief distinct from the award of damages.[21] The distinction is further reflected in c. 93A by the fact that even when damages are subject to multiplication under the statute, attorney's fees are not. See *Wallace* v. *American Mfrs. Mut. Ins. Co.*, 22 Mass. App. Ct. 938, 941 (1986) (G. L. c. 93A, § 9, damages, unlike attorney's fees, can be multiplied).

We have long recognized that the award of attorney's fees and costs in consumer actions can be essential to the enforcement of G. L. c. 93A and the important public policy which it serves. "The entire tenor of G. L. c. 93A is to award attorney's fees and costs to a party who succeeds in demonstrating that a defendant has violated G. L. c. 93A, § 2(*a*)." *Commonwealth* v. *Fall River Motor Sales, Inc.*, 409 Mass. 302, 316 (1991). Such a view is consistent with "the scheme of the statute and the Legislature's manifest purpose of deterring misconduct by affording both private and public plaintiffs who succeed in proving violations of G. L. c. 93A, § 2(*a*), reimbursement for their legal services and costs." *Ibid.* The policy of c. 93A underlying

---

[21]Indeed, it is the American common-law practice that each party to a lawsuit is responsible for its own attorney's fees, regardless of its success in the litigation. *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 18-19 (1989). Although G. L. c. 93A constitutes a statutory exception to that rule, recovering one's counsel fees under the statute is by no means automatic, even though a plaintiff has obtained a judgment for damages. A plaintiff can request only those fees and costs that are reasonable and incurred in connection with the c. 93A action. See G. L. c. 93A, § 9(4). Moreover, attorney's fees and costs cannot be recovered by a plaintiff who has rejected a reasonable written offer of settlement made within thirty days of its c. 93A demand letter. *Ibid.*

the award of reasonable attorney's fees and costs in consumer actions is no less important in cases limited to actual damages than it is in those where a party's recovery is subject to multiplication.

B. *Other issues.* Sean argues that the entry of summary judgment was erroneous in three other respects: (1) the denial of an earlier motion for summary judgment, brought by Fidelity, should have precluded the court from allowing the later motion for summary judgment; (2) the allowance of the motion for summary judgment prevented the Barrons from receiving a formal accounting of the value of the account; and (3) the allowance of the motion in limine excluding the testimony of the Barrons' expert prevented the plaintiffs from showing that genuine issues of material fact remained in dispute.

1. *Prior summary judgment decision.* Initially, Fidelity had filed a motion for summary judgment asserting that the Barrons' claims for an accounting and for relief pursuant to G. L. c. 93A were barred by the statute of limitations, G. L. c. 260, § 5A. The motion was denied by a previous judge of the Superior Court on the ground that there remained material issues of fact in dispute regarding when the Barrons' claims accrued.[22] There was no discussion in his written findings, however, as to the substantive merit of the Barrons' claims.

At a later point, once Fidelity had stipulated to liability, any statute of limitations defense that might have been viable was effectively waived.[23] Consequently, the issue raised, but not resolved, in the first motion for summary judgment — whether the Barrons' claims were barred by the statute of limitations — was rendered moot.

The second motion for summary judgment brought by Fidelity argued that the Barrons' case against Fidelity should be dismissed because the plaintiffs could not prove that they were owed more than they had already been paid by Fidelity and the

[22]Claims brought under c. 93A are subject to a four-year period of limitation, G. L. c. 260, § 5A, with the accrual date of each claim being "established by the same principles as govern the determination of the underlying actions." *Hanson Hous. Authy.* v. *Dryvit Sys., Inc.,* 29 Mass. App. Ct. 440, 448 (1990).

[23]The second judge, in ruling on the subsequent motion for summary judgment, noted that "[i]n stipulating to liability, Fidelity has waived obvious and significant statute of limitations defenses."

Commonwealth. Fidelity was entitled to bring this second motion for summary judgment as it was grounded in a wholly new issue not raised or decided in the previous motion for summary judgment. Even if the two motions addressed the same issue, until final judgment, a judge may entertain a motion on which another judge has previously ruled. See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 707-708 (1987), cert. denied, 485 U.S. 940 (1988), and cert. denied, 485 U.S. 962 (1988). See also *Peterson* v. *Hopson*, 306 Mass. 597, 603 (1940) ("[A judge] should . . . hesitate to undo the work of another judge. . . . But until final judgment . . . there is no lack of power, and occasionally the power may properly be exercised").

2. *Accounting*. Sean also argues that the allowance of the motion for summary judgment prevented the submission of an accounting. He asserts that Fidelity did not produce the books and records necessary to provide an accounting and that at least an evidentiary hearing should have been held to adjudicate the state of the account. This assertion is belied, however, by the judge's detailed listing of the numerous documents and records made available to the Barrons by Fidelity during the course of discovery. There is no evidence, on this record, supporting the conclusion that the Barrons were, in any way, denied access to information necessary for the valuation of his account. Indeed, the Barrons were not able to identify for the trial court any specific item which they lacked and without which they could not complete their own calculations. Essentially, Sean received a full accounting with respect to his shares. In the absence of any evidence disputing the valuation of the account proposed by Fidelity (and adopted by the judge), there is no triable issue with regard to the need for a further accounting, and the allowance of summary judgment was proper.

3. *Expert testimony*. The Barrons' expert was excluded from testifying at trial as a result of the plaintiffs' failure adequately to answer Fidelity's expert interrogatories and, later, to supplement the answers they did provide. See Mass.R.Civ.P. 26(e)(1). Moreover, on the eve of trial, the Barrons presented Fidelity with a wholly new valuation of the account, which was different from what they had previously produced during discovery. See Mass.R. Civ.P. 26(e)(2). In these circumstances, the judge had the author-

ity and the discretion to exclude the expert's testimony. See *Kearns* v. *Ellis*, 18 Mass. App. Ct. 923, 924-925 (1984). See also *Commonwealth* v. *Chappee*, 397 Mass. 508, 515-519 (1986); Liacos, Massachusetts Evidence § 7.6, at 384 n.1 (7th ed. 1999). There was no error.

Nonetheless, Sean insists in this appeal that genuine issues of material fact remain in dispute and that he should have been allowed to offer expert testimony to demonstrate that point. From our vantage point, it appears that the only issue that remained to be tried was the amount of damages owed. Yet, even if he were allowed to use his expert, Sean would be unable to demonstrate that he was owed more than the $256,992.95 that had already been paid.

Sean asserts that Fidelity erred when it calculated the number of his shares to be transferred to the Commonwealth in February, 1982. In support of this claim, Sean relies upon representations, later disavowed, that were contained in the original affidavit of the Assistant Treasurer for systems and development, who was responsible for overseeing the unclaimed property division. In her affidavit, she stated that upon her review of the division's records, she determined that Fidelity had filed a report with the unclaimed property division in March, 1981, stating that it held 655.508 shares in Sean Barron's account. According to Sean, had Fidelity, pursuant to its ongoing practice, used the subsequent May and June, 1981, dividends and resulting distributions to purchase additional shares, the total number of shares in his account would have increased to 1,179.142 by the date of transfer in February, 1982. Yet, the record indicates that only 783.508 shares (655.508 in the account, plus the 128 certificates held by Sean) were, in fact, transferred to the Commonwealth. Thus, Sean concludes, had his expert been allowed to testify, he would have shown that Fidelity still owes him for shares that were neither transferred to the Commonwealth nor taken into account when Fidelity issued its check to him in the amount of $152,379.30.

Sean makes this argument despite the fact that approximately one month after her first affidavit, the Assistant Treasurer declared in a second affidavit that her original statement concerning the number of Sean's shares was inaccurate, noting

that the records of the unclaimed property division did not state the exact date on which Fidelity had filed its report that Sean's abandoned account contained 655.508 shares. She ascertained from the records, however, that Fidelity had filed the report no later than November, 1981, the month by which all preliminary reports of abandoned property, valued as of June 30 of that year, must be filed. See G. L. c. 200A, § 7(*d*).

In light of the information contained in the second affidavit, it can be inferred that Fidelity's report to the unclaimed property division would have calculated the number of Sean's shares as of the statutory date of June 30, 1981. Thus, any dividends issued prior to that date would already have been reflected in the reported total of 783.508 shares that were later transferred to the Commonwealth. Considering the Assistant Treasurer's second affidavit, the judge determined that, if called to testify at trial, she would not be supportive of the Barrons' position in light of her revision of the information critical to the plaintiffs.[24]

Sean offers no other evidence to substantiate his figure of 1,179.142 as the number of shares that should have accrued in his account as of the date of Fidelity's wrongful transfer. In the absence of such proof, and because the valuations calculated by the experts for Fidelity and Sean differed only in the number of shares that should have been transferred to the Commonwealth, Sean has no basis upon which to claim that he has been paid less than the actual value that his account would have achieved had it not escheated to the Commonwealth and subsequently been liquidated. Accordingly, there is no likelihood that Sean would have recovered any additional sums at trial, and summary judgment in favor of Fidelity was appropriate.

*Disposition of the appeal.* So much of the judgment as disallows the recovery of reasonable attorney's fees for the plaintiff is reversed, and the matter is remanded for a determination of appropriate attorney's fees and costs pursuant to c. 93A, § 9(4). The judgment is otherwise affirmed.

*So ordered.*

---

[24]Moreover, while her prior affidavit could have been introduced in an effort to impeach her if she were to testify, it could not have been used for substantive purposes. *Commonwealth* v. *Rosa*, 412 Mass. 147, 156 (1992).