JUDITH TOMPSON *vs.* DEPARTMENT OF MENTAL HEALTH.

No. 08-P-1365.

Suffolk. May 12, 2009. - April 12, 2010.

Present: KANTROWITZ, MCHUGH, & MEADE, JJ.

*Practice, Civil,* Summary judgment. *Anti-Discrimination Law,* Termination of employment, Handicap, Prima facie case, Burden of proof. *Employment,* Discrimination, Termination. *Handicapped Persons.*

In an employment discrimination action, the Superior Court judge acted within his discretion in granting the defendant employer leave to file a summary judgment motion beyond the time allowed by the tracking order, notwithstanding earlier refusals to do so by other judges, where the standing order that set the time for filing such motions recognized that discretion, and where the summary judgment motion raised, on a relatively straightforward record, a potentially dispositive question of law, namely, whether there were genuine issues of material fact for resolution at trial regarding two essential elements of the plaintiff's case, i.e., the plaintiff's status as a qualified handicapped person and the reasonableness of the accommodation requested. [591-592]

In an employment discrimination case in which the plaintiff alleged that the defendant employer had failed to reasonably accommodate her disability, the Superior Court judge did not err in granting summary judgment in favor of the employer, where the record revealed that the plaintiff was not a qualified handicapped person, given that the plaintiff's four-hour limitation on her ability to work disabled her from performing an essential function of her job (namely, supervising a full eight-hour shift of workers who were engaged in providing services to people whose disabilities prevented them from safely and reliably taking care of themselves), and her request for a four-hour workday was not a reasonable accommodation but a fundamental redesign of her job that effectively reallocated some of her responsibilities to others. [592-597]

CIVIL ACTION commenced in the Superior Court Department on October 17, 2005.

The case was heard by *Charles T. Spurlock,* J., on a motion for summary judgment.

*Jeffrey R. Mazer* for the plaintiff.

*Teresa W. Walsh,* Assistant Attorney General, for the defendant.

McHugh, J. Judith Tompson appeals from a summary judgment entered in Superior Court dismissing an employment discrimination complaint she filed against her employer, the Department of Mental Health (DMH). Essentially, Tompson's complaint alleged that she was a qualified handicapped person whom the DMH had discharged without making a reasonable accommodation so that she could continue working with the disability she undoubtedly had. Because the record reveals that Tompson was not a qualified handicapped person, we affirm the judgment of dismissal.

*Background.* In 1996, the DMH hired Tompson as a Mental Health Worker I. Her duties included retrieving client medication at the pharmacy, traveling to clients' homes, and driving clients to medical appointments. Three years later, the DMH promoted Tompson to Mental Health Worker III, a supervisory position, but one that contained some direct care responsibilities as well.[1]

---

[1]The record contains the following "general statement of duties and responsibilities" of a Mental Health Worker III, the position Tompson held:

> "Assists the Program Director in overseeing the clients and staff and the general management of the facility. Provides administrative and clinical supervision to all staff through the Program Director and the Director of Community Services. Provide direct care services to program clients in accordance with their rehabilitative needs and treatment goals. Completes all necessary documentation in accordance with program and department standards. Secure community services necessary in the treatment of clients. Performs related work as required."

The record also contains a "detailed statement of duties and responsibilities" of this position, included among which are the following:

> "4. Responsible for the supervision of assigned staff to help them problem solve and identify resources to ensure the highest quality services. Ensures the collection of appropriate statistical material from assigned staff.
>
> ". . .
>
> "9. Responsible to oversee the general management of the facility, document and coordinate needed repairs.
>
> "10. Demonstrates basic communication and intervention skills by applying various crisis prevention and crisis intervention approaches.
>
> ". . .
>
> "14. Responsible to oversee all written documentation necessary for client and program operations. Ensures completion of client records and

In 1997, before her promotion, Tompson was diagnosed with ulcerative colitis, a condition that affects the colon, but she nevertheless was able to continue her work and carry out her responsibilities. In April, 2000, however, she took a seven-month medical leave to undergo treatment for her condition. In December, 2000, one month after Tompson returned to work, the DMH promoted her to Residential Supervisor III, also a supervisory position, but one with broader responsibilities. In her new capacity, Tompson oversaw two residential DMH programs and supervised approximately fifteen employees. Tompson's new position was covered by a collective bargaining agreement that placed her in a six-month probationary status, during which the DMH had the right to return her to her previous position if her performance was below expectations.

At some point in early 2001, Tompson received a performance review indicating that she met all DMH expectations with the exception of those involving her supervisory responsibilities. In April, 2001, she met with her supervisors, one of whom asked Tompson to "exercise [her] rights to return to [her] Mental Health Worker" III position because "things were not going well" in her new position. Tompson claims that the supervisor gave no "specific work performance reason" for the request but "asked [her] a few times whether [she] was well enough to do the job."

Tompson declined the supervisor's request. Later that month, however, she began a second medical leave, following emergency surgery on April 17, 2001, for perirectal disease, an event that caused her physicians to change her diagnosis from colitis to

relevant data and documentation necessary for a complete up to date record of services according to program and department standards.

". . .

"10. [sic] Carries out job duties in a professional manner by exhibiting a positive, flexible attitude and initiating opportunities for personal and professional growth to enhance the overall operations of the state operated programs.

". . .

"19. Responsible for transporting clients to all necessary appointments or activities by state or personal vehicle."

Under "license and/or certification requirements," the job description listed "[p]ossession of a current and valid Massachusetts Driver's License."

Crohn's disease. On May 21, 2001, during her medical leave, Tompson applied for Social Security Disability Insurance (SSDI) benefits, stating on her application, "I became unable to work because of my disabling condition on April 17, [2001] . . . [and] am still disabled." The Social Security Administration (SSA) allowed her claim, and under applicable rules, she began receiving benefits in December, 2001. She continued to receive the same monthly benefit, adjusted for inflation, at all material times thereafter, including the periods when she returned to work at the DMH.

In June, 2001, while Tompson was on her second medical leave, the DMH demoted her to her former position of Mental Health Worker III, an action she believed the DMH took as a result of her disability. With the assistance of union representatives, Tompson challenged the demotion. Ultimately, however, she, her supervisors, and her union representatives agreed that her medical leave would end on December 15, 2002,[2] and that she then would return to work in a Mental Health Worker III position.

Tompson did return to work in December, 2002. She accompanied her return with a note from her treating physician setting forth "absolute limitations" on her working conditions. The restrictions included a prohibition on driving except to and from work, a work limit of no more than eight hours each day, and a requirement that she remain near a bathroom at all times. The DMH accommodated those constraints without objection, although the limitation on Tompson's ability to drive directly affected one of the specific requirements of her job. See note 1, *supra.*

One month later, in early January, 2003, Tompson presented the DMH with another note from her physician, this one adding an additional "absolute limitation," reducing her working hours to four per day. After receiving that note, the DMH notified Tompson by letter that she could not remain in her position while working a four-hour day because her job "require[d] that the incumbent work a full time schedule." The DMH letter

---

[2]The applicable collective bargaining agreement allowed Tompson fifty-two consecutive weeks of leave under the Family and Medical Leave Act. Tompson's first leave was for approximately seven months, and her second, as a result of the agreement described in the text, was for approximately nineteen months, i.e., seventy-six consecutive weeks.

alerted Tompson to available part-time positions in a different unit from the one in which she was then working. The DMH maintained, however, that continued work in Tompson's current unit required her to supervise staff members during their full eight- to ten-hour shifts.

Tompson "wasn't interested" in the part-time positions the DMH suggested and never explored that option. Instead, although her shift started at 3:00 P.M. and ended at 11:30 P.M., she began in early January, 2003, to depart at 7:00 P.M., exactly four hours into the shift, leaving coworkers to cover her remaining hours.

Tompson's approach to her shift responsibilities led the DMH to convene a hearing on February 19, 2003, to determine whether Tompson could perform the essential functions of her job. By then, in response to a DMH request for information regarding the length of time the four-hour limitation would be in effect, Tompson had provided the DMH with a supplemental physician's note stating that the physician would "re-evaluate again in roughly 2-3 months to see if there has been any interval change . . . that may allow her to work more hours. At present, however, she needs to be maintained on [the four-hour] part-time [status] until further notice."

As a result of the hearing, the DMH found that Tompson could not perform her essential job responsibilities and stated in a termination letter to her dated March 26, 2003, that her restrictions:

> "limited her ability to assist clients in a community setting, restricted her ability to be a shift supervisor, limited her ability to write shift report[s], made her unable to close out the shift, and narrowed her time for role modeling, training and guidance to less experienced staff."

The DMH terminated her employment effective March 31, 2003.

In April, 2003, Tompson filed a charge with the Massachusetts Commission Against Discrimination (MCAD), alleging that, in discharging her, the DMH had engaged in handicap discrimination in violation of G. L. c. 151B, § 4. The MCAD dismissed the charge, finding that Tompson was not a qualified handicapped person under the statute and, thus, that her discharge did not violate the statute. That finding was upheld on administrative appeal.

Tompson then commenced the present action against the DMH in Superior Court, again alleging handicap discrimination in violation of G. L. c. 151B. At an April 25, 2007, pretrial conference, the DMH sought leave to file a summary judgment motion after expiration of the time set by the applicable time standards tracking order. See Superior Court Standing Order 1-88. A Superior Court judge denied the request. In August, 2007, the DMH filed a second motion for leave to file the summary judgment motion. A second judge denied the motion without prejudice, indicating that the DMH should direct it to the first judge. The DMH did so, and the first judge again denied it. Undaunted, the DMH filed essentially the same motion with a third judge, who allowed the late filing and then, in a comprehensive decision after hearing, allowed the summary judgment motion. In essence, the third judge found that Tompson's request for a four-hour workday was a request for an unreasonable accommodation, and also found that Tompson could not satisfy her burden of proving that she was a qualified handicapped person within the meaning of c. 151B, §§ 1 and 4.

Tompson now appeals, claiming the third judge erred in granting the DMH leave to file a late summary judgment motion, in determining that she was not a qualified handicapped person under G. L. c. 151B, in finding that her request for a four-hour workday was unreasonable, and in failing to engage in an interactive process designed to produce an acceptable accommodation. The DMH, while agreeing with the result the third judge reached and the reasoning he advanced, also argues that Tompson's receipt of SSDI benefits estops her from claiming that she can perform the essential functions of her job. We turn to each of those claims.

*Discussion.* a. *Timing of summary judgment motion.* The third judge acted within his discretion when he granted the DMH leave to file a summary judgment motion beyond the time allowed by the tracking order. See *Bonnie W.* v. *Commonwealth,* 419 Mass. 122, 123 n.1 (1994) (rejecting argument that because summary judgment motion was not timely filed in compliance with Superior Court Standing Order 1-88, the Superior Court lacked jurisdiction to allow it). The standing order that set the time for filing such motions recognized that discretion. See Superior Court Standing Order 1-88(D)(1). As with other inter-

locutory decisions, the judge had this discretion even though a different judge previously had denied a similar motion. See *I.S.K. Con of New England* v. *Boston*, 19 Mass. App. Ct. 327, 329 (1985) ("When a judge reviews an interlocutory decision in the same case by another judge of the same court, the second judge has the power to review or modify the prior decision"); *Barron* v. *Fidelity Magellan Fund*, 57 Mass. App. Ct. 507, 519 (2003) ("until final judgment, a judge may entertain a motion on which another judge has previously ruled").

That is not to say that the third judge was required to entertain the motion after the first judge denied it, or that, in exercising his discretion to do so, he was free to ignore the admonition that "[a] judge should hesitate to undo his own work . . . . Still more should he hesitate to undo the work of another judge." *Peterson* v. *Hopson*, 306 Mass. 597, 603 (1940). See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 707 (1987), cert. denied, 485 U.S. 940, and cert. denied, 485 U.S. 962 (1988). "But until final judgment . . . there is no lack of power [to reexamine], and occasionally the power may properly be exercised." *Peterson* v. *Hopson, supra. King* v. *Globe Newspaper Co., supra.* See *Bank of America, N.A.* v. *Prestige Imports, Inc.*, 75 Mass. App. Ct. 741, 768 (2009).

The DMH's summary judgment motion raised, on a relatively straightforward record, a potentially dispositive question of law, i.e., whether there were genuine issues of material fact for resolution at trial regarding Tompson's status as a qualified handicapped person, and regarding whether her request for a four-hour workday was a request for a reasonable accommodation, both of which were essential elements of her case. If there were no genuine issue on either score, then a trial would be futile and a waste of resources, public and private. In those circumstances, the third judge acted within his discretion in considering the motion, notwithstanding his colleagues' earlier refusals to do so.

b. *Substance of summary judgment motion.* Turning to substance, we review, de novo, the decision to grant summary judgment in favor of the DMH. See *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007). In conducting that review, we look at the record to see "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a

matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). As the moving party, the DMH bore the burden to affirmatively demonstrate "the absence of a genuine issue of material fact on every relevant issue, regardless of who would have the burden on that issue at trial." *Arcidi* v. *National Assn. of Govt. Employees, Inc.*, 447 Mass. 616, 619 (2006). The DMH could carry that burden either by affirmatively negating the essential elements of Tompson's claim or by showing that she had no reasonable expectation of proving an essential element of her case at trial. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

Cases alleging discrimination generally proceed in the three-stage order of proof articulated in, for example, *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 441-443 (1995). The first stage requires Tompson to establish a prima facie case of discrimination. See *id.* at 441; *Brooks* v. *Peabody & Arnold, LLP*, 71 Mass. App. Ct. 46, 51 (2008). At the summary judgment stage, therefore, the question is whether the record contains a genuine issue of material fact regarding her ability to do so.

A prima facie case of employment discrimination based on disability requires a showing that Tompson "is 'handicapped,' that she is a 'qualified handicapped person,' and that she was terminated because of her handicap." *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 449 (2002) (*Russell*). "The term 'handicap' means (*a*) a physical or mental impairment which substantially limits one or more major life activities of a person; [or] (*b*) a record of having such impairment . . . ." G. L. c. 151B, § 1, as appearing in St. 1989, c. 722, § 11. Given that definition, this record leaves no doubt either that Tompson had a "handicap" or that her handicap was the basis for her discharge.[3]

The essential question, therefore, becomes whether there was a genuine issue of material fact regarding Tompson's status as a "qualified handicapped person," which the statute defines as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with

---

[3]The DMH makes no claim that Tompson's election to begin leaving her job four hours into her shift was, independent of her inability to work longer, the reason for her discharge.

reasonable accommodation to [her] handicap." G. L. c. 151B, § 1(16), inserted by St. 1983, c. 533, § 2.

The DMH maintains that three aspects of this record reveal Tompson's inability to show at trial that she is a qualified handicapped person. The first is that her receipt of SSDI benefits estops her from doing so. Second, she is unable to meet the first prong of the statutory definition because her handicap prevents her from performing the essential functions of her position. Finally, the DMH claims she cannot meet the second prong of the definition because her request for a four-hour workday was not a request for a reasonable accommodation.

Dealing first with estoppel, decided Massachusetts cases have held that the admission of an inability to work, which is an inherent part of an application for SSDI benefits, is some evidence of inability to work even with a reasonable accommodation, but does not automatically estop a claimant from showing that she can work despite her handicap. See, e.g., *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 818-820 (1997); *Russell*, 437 Mass. at 452-453. Instead, a genuine issue of material fact on the subject exists if the record contains "evidence of [the plaintiff's] ability [to work] (including her ability if provided 'reasonable accommodation'), or through an explanation of how her disability claims and employment discrimination claims are consistent, sufficient to warrant a reasonable juror's conclusion that the plaintiff could perform the essential functions of the job." *Russell, supra* at 452.

To be sure, neither of the cited cases, nor any of the cases they discussed in any detail, dealt with a plaintiff like Tompson, who was actually working while she received SSDI benefits. Actual work, however, is the best evidence of ability to work. In the face of such evidence, any estoppel claim rests solely on a policy aimed at preventing SSDI claimants from playing "fast and loose with the courts" by asserting one set of facts in the discrimination case while asserting directly contradictory facts to obtain money from the Federal government.[4] *Id.* at 450. Whatever the strength of that policy, if the record revealed a direct

---

[4] Playing "fast and loose with the courts" also may be playing fast and loose with the SSA. *Russell, supra* at 450. The latter activity has its own consequences, for the SSDI benefit application reminds applicants that making false statements in an application is a Federal crime.

contradiction, this record does not. Instead, the record contains a letter from the SSA to Tompson notifying her that her application for SSDI benefits had been granted, and stating, in part, that "[i]f you go to work, special rules can allow us to continue your cash payments and health insurance coverage." Nothing in the record, or in the briefs the parties filed here, touches on the content of the special rules, nor does the record contain anything overtly bearing on Tompson's compliance with them. In those circumstances, we think that the doctrine of estoppel did not require allowance of the summary judgment motion.

That conclusion returns our analysis to the two-pronged definition of "qualified handicapped person," i.e., a person capable of performing essential job functions despite the handicap, or a person capable of performing those functions with a reasonable accommodation. As for the first prong of the definition, the record reveals that the four-hour limitation on Tompson's ability to work disabled her from performing an essential function of her job, namely, supervising a full shift of workers who were engaged in providing services to people whose disabilities prevented them from safely and reliably taking care of themselves. See, e.g., *Guice-Mills* v. *Derwinski*, 967 F.2d 794, 796, 798 (2d Cir. 1992) (supervisor who was physically disabled from getting to hospital by beginning of shift she was assigned to supervise was not qualified to perform essential function of her position). Tompson claims that supervision of an eight-hour shift was not an essential requirement of her job because others in her position were allowed to work ten-hour shifts, four days per week. But the fact that some ten-hour shifts may have been available does not help her. She was limited to four hours per day, and the record is devoid of any suggestion that the DMH had any four-hour shifts for someone in her position, or that anyone performing duties similar to hers was permitted to work a four-hour day.

Looking, then, at the second prong of the definition, the question is whether, on this record, there is a genuine issue of material fact whether the four-hour day Tompson requested amounted to a reasonable accommodation that would have permitted her to perform the relevant essential job functions, and that the DMH was, therefore, required to provide. It was not. A four-hour workday would not have allowed Tompson to supervise an eight-hour

shift, and nothing in the record suggests that four-hour shifts were available at the facility where she was working, although they were available at other facilities she had no interest in exploring. Moreover, accommodating the four-hour limitation meant either that Tompson's shift would have no supervision for half of the time or that someone else would have to cover for Tompson and perform her work for one-half of the shift. Tompson's request was not limited in time,[5] and it came on top of a restriction on her ability to drive, which, although accommodated by the DMH, was already inconsistent with her job requirements.

In the final analysis, Tompson sought not a reasonable accommodation but a fundamental redesign of her job that effectively reallocated some of her responsibilities to others. The requirement to provide a reasonable accommodation does not require an employer to engage in that kind of fundamental job restructuring, particularly on an open-ended basis. See *Soto-Ocasio* v. *Federal Exp. Corp.*, 150 F.3d 14, 20 (1st Cir. 1998) ("reallocation of job functions exceeds the scope of reasonable accommodation"); *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. 375, 383 (1993), quoting from *School Bd. of Nassau County* v. *Arline*, 480 U.S. 273, 287 n.17 (1987) (reasonable accommodation does not require "fundamental alteration" in way business is conducted); *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 542 (1995) ("An employer, however, may refuse to accommodate any handicap that necessitates the substantial modification of employment standards").

Tompson's final argument is that, even if the DMH were not required to provide an accommodation precisely conforming to her request, it failed to engage in an "interactive process" designed to determine whether an accommodation satisfying her needs and those of the DMH could be found. See *Russell*, 437 Mass. at 457, citing *Taylor* v. *Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), cert. denied, 519 U.S. 1029 (1996). Assuming that, on this record, participation in an interactive

---

[5]As noted, *supra*, the physician's letter Tompson produced in response to the DMH request for an estimate of the length of time the four-hour work restriction would extend simply said that her physicians would reevaluate her condition in two to three months. By the time of the hearing and the subsequent DMH discharge letter more than two months later, no reevaluation appears to have occurred.

process was required, see *Ocean Spray Cranberries, Inc.* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 632, 648-649 (2004); but see *Massachusetts Bay Transp. Authy.* v. *Massachusetts Commn. Against Discrimination*, 450 Mass. 327, 341-342 (2008), the DMH began such a process when it offered to explore with Tompson part-time positions in a different DMH unit, an offer Tompson flatly rejected without any exploration whatsoever. By its very nature, interaction envisions mutual exploration, not a process in which one side is required to serve up possible solutions while the other side simply awaits the arrival of an offer to its liking. On this record, the DMH satisfied whatever obligation to engage in an interactive process the law imposed.

*Judgment affirmed.*