CHELSEA D. SCOTT & another[1] vs. ENCORE IMAGES, INC.,
& another.[2]

No. 10-P-1222.

Essex. March 7, 2011. - October 18, 2011.

Present: McHUGH, SMITH, & CARHART, JJ.

*Anti-Discrimination Law,* Employment, Handicap, Termination of employment. *Handicapped Persons. Employment,* Discrimination, Termination.

In a civil action claiming discrimination in employment on the basis of handicap, the judge did not err in granting summary judgment in favor of the defendant employer, where the plaintiff failed to demonstrate that he was a qualified handicapped person when he was terminated, in that, three months prior to the time the plaintiff claimed he would have been able to return to work, he accepted a lump-sum workers' compensation settlement, which created a statutory presumption that he was unable to work, even with reasonable accommodation, for thirty months, and the record contained no rebuttal of that presumption; further, given that the record was clear that, at the time of the termination of his employment, the plaintiff was not capable of performing any of the essential requirements of his job, the employer was not required to give him another job or to give him an indefinite leave of absence. [665-668]

In a civil action claiming that the defendant employer harassed and terminated the plaintiff wife because of her husband's disability and in retaliation for confronting the employer about the harassment, even assuming that the wife had "associational" standing to pursue those claims, the judge properly granted summary judgment in favor of the employer, where the record did not support the wife's claim that the employer's actions created a hostile work environment, and where the wife had no reasonable expectation of proving that her termination constituted retaliation as a result of her husband's protected activity. [668-670]

CIVIL ACTION commenced in the Superior Court Department on November 17, 2008.

The case was heard by *Mitchell H. Kaplan,* J., on a motion for summary judgment.

[1]Tina Brelin-Penney.
[2]Laurel Mervis.

*Sol J. Cohen* for the plaintiffs.

*Joseph F. Hardcastle* for the defendants.

*John Pagliaro & Martin J. Newhouse*, for New England Legal Foundation & another, amici curiae, submitted a brief.

McHUGH, J. Chelsea D. Scott and Tina Brelin-Penney, husband and wife, appeal from a Superior Court judgment dismissing employment discrimination claims they brought against their former employer, Encore Images, Inc. (Encore), and Laurel Mervis. The claims stem from an injury Scott suffered while he was employed by Encore as a warehouse coordinator. The injury resulted in a disability, a workers' compensation proceeding and, they claim, their discharge. Both plaintiffs filed claims with the Massachusetts Commission Against Discrimination (MCAD) asserting that they had been terminated in violation of G. L. c. 151B. Later, they filed claims in Superior Court[3] where, after completion of customary preliminaries, Encore moved for summary judgment. A judge of that court allowed the motion in a comprehensive and thoughtful memorandum. Judgment of dismissal soon entered, and this appeal followed. We affirm.

*Background.* It appears that Encore is a small manufacturer of toner ink cartridges for printers and facsimile machines, and provides in-house servicing and repairs for its customers. The company, which employs approximately fourteen people, is owned and operated by Paul and Laurel Mervis.

Encore employed Scott as its warehouse coordinator. The position was described as involving "constant lifting of items of varying weights and sizes anywhere from a few ounces up to approx [fifty pounds]. The majority of job time is spent with the up and down, off and on part of a 'warehouse coordinator' position." Scott's other responsibilities included maintaining and managing the warehouse, shipping and receiving functions such as packaging and shipping orders to customers, and assisting clients and technicians with loading and unloading their cars. Scott worked in the warehouse, and Brelin-Penney worked as Encore's bookkeeper.

On September 11, 2006, Scott fell from a ladder in Encore's

---

[3]No claim is made that they failed to exhaust their administrative remedies before filing their complaint in Super Court.

warehouse and injured his left shoulder. Three days later, a representative from Quadrant Health Strategies, to which Scott had gone for medical care, wrote that Scott could "resume work with limits," which included prohibitions on repetitive motion of his left arm, on reaching above his shoulders or below his knees, and on lifting, pushing, or pulling more than ten pounds. On September 27, 2006, Dr. Freedman of Quadrant Health Strategies changed those limits to prohibit Scott from pushing, pulling, or lifting anything over five pounds.

As a result of the September 27 report, Encore hired an ergonomist to "job shadow" Scott in an effort to find techniques that would allow him to do his job despite the injury and the limitations the doctor imposed. The effort failed. By November 7, 2006, Scott's prognosis worsened when Dr. Fehnel, an orthopedic surgeon, reported he needed surgery for a torn cartilage in his left rotator cuff. As a result, Dr. Fehnel stated that Scott was prohibited from any lifting and should do "desk work only." A day later, Scott informed Laurel Mervis that because he needed surgery, he would not be able to return to work. He did not provide her with an anticipated return date and, in fact, never worked at Encore again.

Scott had shoulder surgery on December 11, 2006. Postoperative orders prohibited him from using his left arm and required that he keep it in a sling for four weeks. The four weeks passed, but a January 17, 2007, medical report revealed that he continued to experience "quite a bit of pain" and that for at least six more weeks he was to lift nothing heavier than a cup of coffee. In that report, Dr. Fehnel observed that he "[would] not have [Scott] return to any warehouse lifting or anything, until he is at least 3, if not 4 months, from the time of his surgery." Moreover, Dr. Fehnel stated that Scott would "remain out of work until [he] reassess[ed] him in mid to end February to assess his progress with therapy and potential modified work capacity in the future."

Notwithstanding a variety of different approaches to treatment, Scott's condition did not improve over the ensuing months. Indeed, on April 26, 2007, Dr. Fehnel reported that Scott was experiencing so much pain that he required emergency room treatment. That report, the last one the record contains, also suggested for the first time that Scott's disability might be permanent.

On June 6, 2007, Scott reached a $45,000 lump-sum settlement with Encore's workers' compensation insurer for future weekly workers' compensation benefits. The settlement was based on an average weekly wage of approximately $700. The Department of Industrial Accidents approved the settlement on July 2, 2007. See G. L. c. 152, § 48. A provisional worker, whom Encore had hired in January to fill Scott's position until he returned, continued to work at Encore until August 7, 2007, and was subsequently replaced with a permanent employee.

By mid-October, Scott's health had improved to the point that he was ready to return to work, though by then he was involved in this litigation and did not inform Encore of his recovery.[4] Instead, he enrolled in a six-week truck driver training program. He successfully completed the program and found employment as a tractor-trailer truck driver within a month thereafter.

As for Brelin-Penney, she claims she and Laurel Mervis enjoyed a friendly relationship before Scott's injury. Beginning in early 2007, she claims, Mervis began to harass her. The harassment consisted of asking her questions on more than five occasions between January and May about Scott's progress and his anticipated return to work. Brelin-Penney characterizes Mervis's tone as accusatory during these conversations, and claims that Mervis would pull Brelin-Penney's employee file and make notes in it while they spoke. Brelin-Penney consistently told Mervis that Scott would return when his doctors cleared him to do so.[5]

---

[4]This is a generous reading of the record, which contains no medical evidence that Scott was ever capable of returning to his warehouse coordinator position. Indeed, Brelin-Penney testified in her deposition that she did not know if Scott's physicians had ever cleared him for return to work at Encore. In his deposition, Scott twice said he "guessed" he was able to return to work at Encore in the fall of 2007. That is all the record contains regarding his ability to return.

[5]In her brief, Brelin-Penney also asserts that, at some point, Mervis told two other Encore employees, in essence, that Scott was only remaining out of work so that he could get a "huge" workers' compensation settlement. Brelin-Penney's deposition testimony is hearsay to which Encore objects here, and to which it objected in the Superior Court. The motion judge did not mention the statements in his comprehensive recitation of the facts, thus impliedly sustaining the objection. We likewise ignore these hearsay statements. See *Madsen* v. *Erwin*, 395 Mass. 715, 721 (1985); *Thorell* v. *ADAP, Inc.*, 58 Mass. App. Ct. 334, 338 (2003).

The rift between Brelin-Penney and Mervis came to a head on May 17, 2007. On that date, Mervis had been speaking with a man named Al Rizzo, who worked with Brelin-Penney's son, Isaiah, in a nearby warehouse where Mervis had helped him get a job. During the conversation, Mervis mentioned that Isaiah was planning to return to college the following month, something Rizzo apparently did not know. She then mentioned the conversation to Brelin-Penney, asking her why Isaiah had not divulged his plans to his employer. That question outraged Brelin-Penney, who accused Mervis of trying to meddle in her family life and trying to get Isaiah fired. The exchange escalated until Brelin-Penney, voice raised in anger, told Mervis that Isaiah thought she was "the rudest fucking person he's ever met," and left the office for home, loudly slamming the door behind her.

Mervis, who has multiple sclerosis and whose physicians had advised her to avoid stressful situations, was extremely upset by the incident. Through a relative who acted as Encore's lawyer, she informed Brelin-Penney that evening that she was not to return to work at Encore again.[6] A letter from Encore informing Brelin-Penney that she had been terminated soon followed.[7]

*Discussion.* We review the allowance of a motion for sum-

---

[6]Brelin-Penney and Scott claim that during Brelin-Penney's May 17, 2007, telephone conversation with Mervis's sister, who was a lawyer, she stated that neither Brelin-Penney nor Scott was to return to work at Encore and that Scott was effectively fired that day. In support of that assertion, they reference a portion of an affidavit Brelin-Penney filed in opposition to Encore's motion for summary judgment. Brelin-Penney's statement in that regard, however, is contrary to her earlier deposition testimony during which she said nothing about the lawyer mentioning Scott or his employment with Encore. A letter from Encore confirming her termination likewise says nothing about Scott. For this reason, the Superior Court judge disregarded the statement in the affidavit, viewing it as an attempt to create an issue of fact where none existed. See *O'Brien* v. *Analog Devices, Inc.*, 34 Mass. App. Ct. 905, 906 (1993) (affidavit testimony which is inconsistent with earlier deposition testimony and made in an attempt to create an issue of fact impeding summary judgment, should be disregarded). But, for the reasons that follow, the outcome of the case would not differ even if the lawyer had mentioned Scott's employment during the telephone conversation.

[7]In material part, the letter said:

"It is the position of Encore Images that you terminated your employment with us as of 12:30 p.m., Thursday, May 17, 2007, after you verbally assaulted Laurel Mervis and then left the workplace four hours before the end of your shift. Your vitriolic verbal attack of Mrs. Mervis

mary judgment de novo, see *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007), seeking to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). See Mass. R. Civ. P. 56(c), as amended, 436 Mass. 1404 (2002).

a. *Scott's claim.* To make out a prima facie case of employment discrimination based on a disability, Scott must show that he was a "qualified handicapped person" and that he was terminated from his job at Encore because of his handicap. *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 449 (2002). For purposes of summary judgment, Encore concedes that Scott was employed by Encore, that his shoulder injury amounted to a handicap as defined by G. L. c. 151B, § 1(17), and that he was terminated from his position because of his handicap.[8] Accordingly, the only disputed issue is whether Scott was a "qualified handicapped person" when he was terminated.

General Laws c. 151B, § 1(16), as inserted by St. 1983, c. 533, § 2, defines a "qualified handicapped person" as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." For two reasons, Scott did not meet that definition.

First, on July 2, 2007, three months before Scott now claims that he would have been able to return to work, he accepted a $45,000 lump-sum workers' compensation settlement. Acceptance of the settlement triggered the provisions of G. L.

---

was a disturbing violation of company policy and an extreme exhibit of insubordination."

The letter made no mention of Scott.

[8]Although all parties agree that Scott was terminated, they do not agree on the date of his termination. Scott now maintains that he was terminated on May 17, 2007, though in proceedings before the MCAD he claimed to have been terminated on the date of his accident, September 11, 2006, and in his complaint in this action, he claimed to have been terminated in November, 2006. As the defendants concede for summary judgment purposes that Scott was terminated because of his handicap, the exact date of his termination is irrelevant.

c. 152, § 48(4), as appearing in St. 1991, c. 398, § 75, which in material part state that:

> "the acceptance of any amount in return for the right to claim future weekly benefits shall create a presumption that the employee is physically incapable of returning to work with the employer where the alleged injury occurred. Such presumption shall continue for a period of one month for each fifteen hundred dollar amount included in the settlement for future weekly benefits. No re-employment rights shall inure to such employee under this chapter during any period of presumption of incapacity as herein provided."

Under the terms of the statute, then, Scott's acceptance of the settlement created a presumption that he was unable to work, even with reasonable accommodation, for thirty months, or until January, 2010. See Safford *vs*. Wyman Gordon Co., U.S. Dist. Ct., No. 96-40185-NMG, slip op. at 6 (D. Mass Nov. 10, 1997).[9]

Although § 48(4) creates a presumption, the presumption is rebuttable. Here, though, the record contains no rebuttal. Indeed, Scott has not discussed, or even cited, the statute, and the record is devoid of any evidence that Scott ever received medical clearance to resume work as a warehouse coordinator. Instead, he underwent retraining and found another line of work.

Even if one puts § 48(4) entirely to one side, Scott faces a second insurmountable problem. The record will not support his claim to be a qualified handicapped person, i.e., a person who could, with reasonable accommodation, perform the essential functions of his job. By April 26, 2007, almost eight months after the accident, the record is clear that he was not capable of performing any of the essential requirements of the job. Nevertheless, Encore had installed a placeholder and had kept the job open pending Scott's recovery.

At that point, only two accommodations were possible. One

---

[9]Our conclusion is not inconsistent with the Supreme Judicial Court's decision in *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. at 453. That case involved the question, on a record very different from this one, whether the plaintiff's receipt of workers' compensation benefits for total disability estopped her from claiming to be a qualified handicapped person. No issue in the case involved an express statutory presumption like the one contained in § 48(4).

would have been to provide Scott with a different job. But the record contains no evidence that Encore had another job to give Scott and, even if it did, it was not required to do so. See, e.g., *Russell* v. *Cooley Dickinson Hosp., Inc.,* 437 Mass. at 454; *Tompson* v. *Department of Mental Health,* 76 Mass. App. Ct. 586, 596 (2010). The other would have been to give him an indefinite leave of absence, another step Encore was not required to take. *Russell, supra* at 455-457.[10]

On this record, therefore, Scott was not a "qualified handicapped person" and Encore did not impermissibly discriminate against him when it discharged him from his employment. Consequently, the judge properly allowed Encore's motion for summary judgment dismissing his claim.

b. *Brelin-Penney's claim.* Brelin-Penney claims that Encore harassed and terminated her because of Scott's disability and in retaliation for confronting Laurel Mervis about the harassment. She does not claim that she, herself, is disabled or that she was terminated because of her own disability, but claims "associational standing" to pursue the claims just described.

Encore resists Brelin-Penney's claim by asserting that G. L. c. 151B provides no basis for an "associational" claim like the one she proffers.[11] It acknowledges that the MCAD, in three opinions issued over the past thirty years, has allowed such

---

[10]The record is clear that Encore attempted to work with Scott to help him to return to work and in doing so fulfilled its obligation to engage in an "interactive process." See *Russell,* 437 Mass. at 457; *Leach* v. *Commissioner of the Mass. Rehabilitation Commn.,* 63 Mass. App. Ct. 563, 569 (2005). See also *Andover Hous. Authy.* v. *Shkolnik,* 443 Mass. 300, 308 (2005); *Ocean Spray Cranberries, Inc.* v. *Massachusetts Commn. Against Discrimination,* 441 Mass. 632, 649 n.21 (2004). As noted, Encore hired an ergonomist to assist Scott in determining whether and what accommodations Scott could use to fulfil his job requirements. Paul and Laurel Mervis also arranged for Encore's plant manager to take over some of Scott's essential job functions while Scott recovered. When that arrangement became untenable for the company, Encore hired a replacement for Scott's position but was explicit with the new employee that the job was temporary. Encore did not permanently replace Scott until August, 2007. These actions fully met Encore's obligations. See, e.g., *Mammone* v. *President & Fellows of Harvard College,* 446 Mass. 657, 669 n.25 (2006). See also *Russell,* 437 Mass. at 454, 457; *Andover Hous. Authy.* v. *Shkolnik, supra.*

[11]Encore's position is supported by the amici, New England Legal Foundation and Associated Industries of Massachusetts.

claims to proceed[12] but states that, in doing so, the MCAD exceeded its authority. The language of the statute does not embrace such claims, Encore asserts, and it points to *Macauley* v. *Massachusetts Commn. Against Discrimination*, 379 Mass. 279, 280 (1979), for the proposition that the MCAD has no power to stretch the statute so as to encompass claims the Legislature did not include.

This is a case of first impression for this court, but this is not the record on which to decide it, for even if Brelin-Penney has associational standing, her claim fails. To make out a prima facie case for retaliation based on Scott's disability, Brelin-Penney has the burden to show that Scott engaged in a protected activity, here the filing of a workers' compensation claim; that Encore was aware of the protected activity; that Encore engaged in an adverse employment action against Brelin-Penney; and that but for Scott's actions, Encore would not have taken the adverse action. See *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 662-663 (1996); *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997); *Mole* v. *University of Mass.*, 442 Mass. 582, 591-592 (2004).

Encore does not contest that it knew that Scott filed a workers' compensation claim, nor does it contest that the filing of the claim is protected activity. Accordingly, the only disputed issues are whether Brelin-Penney suffered any adverse employment action and, if so, whether the adverse action constituted retaliation as a result of Scott's protected activity.

Brelin-Penney claims that Encore's adverse action consisted of two elements: Laurel Mervis's harassment, which created a hostile work environment, and Brelin-Penney's termination. A hostile work environment however, may only serve as the basis for a retaliation charge if it is "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher* v. *Boca Raton*, 524 U.S. 775, 787 (1998). In considering the totality of the circumstances, including the severity, frequency, and

[12]The three opinions are *Romano* v. *Lowell Paper Box Co.*, 4 Mass. Discrimination L. Rep. 1087 (1982); *Dittbenner* v. *Hapco Auto Parts, Inc.*, 11 Mass. Discrimination L. Rep. 1139 (1989) (wife had standing to assert claim based on husband's disability); and *Snelders* v. *Boston Hous. Authy.*, 23 Mass. Discrimination L. Rep. 339 (2001) (same).

threatening nature of the alleged harassment and whether it interfered with Brelin-Penney's work performance, *id.* at 787-788, this record does not support Brelin-Penney's claim that Mervis's actions created a hostile work environment.

Brelin-Penney's harassment claim arises out of the more than five instances between January and May, 2007, on which Mervis asked her questions in an accusatory tone about Scott's progress and his anticipated return to work, often making notes in her employment file as they spoke. These interchanges cannot be characterized as "severe or pervasive harassment that materially altered the conditions of [Brelin-Penney's] employment." *Noviello* v. *Boston*, 398 F.3d 76, 92 (1st Cir. 2005). Brelin-Penney testified that at no time did Mervis threaten her or her job. In addition, there are no allegations that Brelin-Penney's work performance was hampered during this period. In December, 2006, she received an "above average" performance review from Mervis which was accompanied with a salary increase. Moreover, through the spring of 2007, well after Scott's workers' compensation claim had been filed, Mervis, consistent with her friendly relationship with Brelin-Penney, continued giving her gifts and financial assistance.

As for Brelin-Penney's discharge, though it is undisputed that termination from employment is an adverse employment action, this claim fails as well because she has no reasonable expectation of proving causation, an essential element of a viable retaliation claim. *Brunner* v. *Stone & Webster Engr. Corp.*, 413 Mass. 698, 705 (1992). In rebuttal to Brelin-Penney's claim that she was fired because of Scott's actions, Encore presented evidence that Brelin-Penney was fired because of the way she conducted herself and the language she used during the argument she had with Mervis about Mervis's conversation with Al Rizzo. Upon Encore's submission of a reason for her lawful termination, the burden shifted back to Brelin-Penney to show that Encore's reasons were pretextual. *Mole*, 442 Mass. at 591-592. However, Brelin-Penney does not deny her part in the argument, does not deny Mervis's pre-existing condition, and does not deny the impact Brelin-Penney's conduct had on Mervis. Her claim fails as a matter of law.

*Judgment affirmed.*