# United States Court of Appeals
## For the First Circuit

No. 11-1666

KATHY HENRY,

Plaintiff, Appellant,

v.

UNITED BANK,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Kenneth P. Neiman, U.S. Magistrate Judge]

Before

Torruella, Howard and Thompson,
Circuit Judges.

Michael O. Shea, with whom Law Office of Michael O. Shea, P.C. was on brief, for appellant.
Marylou Fabbo, with whom Skoler, Abbot & Presser, P.C. was on brief, for appellee.

July 13, 2012

**HOWARD**, **Circuit Judge**.  Plaintiff-appellant Kathy Henry appeals an award of summary judgment in favor of her former employer, defendant-appellee United Bank, on her claims of retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, and disability discrimination in violation of Massachusetts law, Mass. Gen. L. ch. 151B.  Her claims arise from United Bank's decision to terminate her employment after she had exhausted 12 weeks of medical leave.  Agreeing with the magistrate judge that the undisputed material facts compel judgment in favor of United Bank, we affirm.

## I. Background

We recite the facts in the light most favorable to Henry as the non-moving party.  See Jones v. Walgreen Co., 679 F.3d 9, 12 (1st Cir. 2012).  Henry began working for United Bank in 2006 as a commercial loan administrative assistant and in the following year was promoted to the position of commercial credit analyst.  As a credit analyst, her tasks included evaluating the credit-worthiness of commercial borrowers and making lending recommendations.  She reported to Joanne Sheedy, the Assistant Vice President of Credit, who in turn reported to Jack Patterson, the Vice President of Risk Management.

In January 2008, Henry began experiencing neck pain, blurred vision, and dizziness.  Her primary care physician (PCP) Dr. Suzanne Jorey examined her and referred her to a neurologist,

-2-

Dr. Christopher Comey. Dr. Comey determined that Henry was suffering from a spinal cord compression in her cervical spine. She received physical therapy during this time frame and scheduled another appointment with Dr. Comey for early September. That appointment was later changed to September 24. Henry kept the bank informed of her physical condition and of the scheduled September appointment with the neurologist.

With some workplace accommodations provided by the bank, Henry was able to perform her job for a time. These accommodations included, for example, an ergonomic chair and modifications to an air conditioning vent in the plaintiff's office. Henry also compensated for her sedentary position by walking around several times during the day. Despite these adjustments, however, her symptoms worsened, and on the first day of July she had difficulty getting out of bed. That day Henry went to her PCP, who examined her and completed an "Excuse Slip." This note, which Henry gave to the bank, stated that she would be on "bed rest until further notice."

Near the end of July, Henry's PCP recommended that her leave of absence be extended for three weeks while further tests were performed and a diagnosis reached. In mid-August, the PCP provided an "Attending Physician Statement" to the Bank. This statement noted that Henry could not sit all day, that she suffered a decreased range of motion in her neck and back, and that it was

"indeterminable" when she could return to work. Henry told the bank's human resources department that her PCP wanted her to remain out of work until her appointment with the neurologist at the end of September.

Intermittently over the course of the summer, Henry's employer provided her with forms to complete for FMLA leave and short-term disability leave. Toward the end of July, the bank informed her that her 12-week "FMLA/Disability leave" had begun on July 1, leaving about nine more weeks of leave time remaining. In early September, however, the bank sent Henry a letter stating that her request for short-term disability had not yet been approved, pending "further documentation from [her] doctor," and, therefore, it was unable to qualify her work absence as FMLA leave. The correspondence included a "Certification of Health Care Provider" form (CHCP form) which was to be completed within fifteen days. At Henry's direction, the bank also sent the form to her PCP's office. A few days later, the bank's disability insurance company informed Henry that her request for short-term disability had been denied due to a lack of medical documentation showing that she was totally disabled.

Meanwhile, Sheedy, Patterson, and Senior Vice President of Human Resources Miriam Siegal met in early September to discuss the staffing needs of the credit analysis department. This discussion included the topic of the bank's ability to continue to

hold Henry's position open indefinitely. Sheedy communicated to Siegal that the department was strained from short staffing; two other credit analysts, as well as Sheedy herself, had been carrying the plaintiff's workload. They opted, however, to wait to make a decision until the end of September.

By mid-month, the bank received the completed CHCP form from the PCP's office. That certification stated that Henry was "not incapacitated" and was "able to perform [her] job" on a normal work schedule with "no heavy lifting." On September 22, Sheedy, Patterson, and Siegal decided that the bank was unable to hold Henry's position open any longer; Siegal told Henry that she was expected to return to work on September 25, after her scheduled September 24 appointment with the neurologist. In her correspondence memorializing the bank's decision, Siegal characterized Henry's "lengthy absence" as "unexcused" and not FMLA-eligible leave, because it had "not been supported by [her] healthcare providers."

The morning of September 25, after she saw her neurologist Henry arrived at the bank with a note authored by him. It stated:

> Ms. Henry is under my care for a neurosurgical condition (cervical myelopathy). Our office will be scheduling a surgical procedure for her in the next few weeks. Due to extreme pain Ms. Henry has been unable to go to work since July 1, 2008, she is to remain out of work until further notice.

When Henry attempted to deliver the note to Lynn Orr, the Payroll and Benefits Administrator, Orr told her that she needed to wait for Siegal to arrive to work in a "few minutes" in order to give the note directly to her. Henry declined to wait and left the note with another employee to deliver to Siegal. Later that same day, Henry sent an email message to Siegal, advising her that the surgery referred to in the neurologist's note was scheduled for October 17. Siegal responded by informing Henry that her employment was terminated, noting that the Bank "cannot continue to hold [her] position open indefinitely" and that she had been given a full 12-week period of FMLA leave commencing July 1, even though the medical documentation did not support it.

Henry took the position that the CHCP form submitted by her primary care physician in August had mistakenly characterized her as able to work. She never provided a statement from the PCP to modify that form, however, nor did she provide an additional CHCP form completed by the neurologist. Henry did undergo the surgery in October, and on April 2009 she was cleared to work without restrictions.

Henry subsequently filed this action, which United Bank removed to federal court, and the parties consented to proceed before a magistrate judge. In due course, the bank moved for summary judgment on all claims, and also sought to strike certain portions of the plaintiff's statement of facts. The magistrate

judge granted the motion to strike in part and entered judgment in favor of United Bank.  This timely appeal followed.

## II. Analysis

We review a grant of summary judgment de novo, taking the record evidence in the light most favorable to Henry as the nonmoving party.  See Hodgens v. General Dynamics Corp., 144 F.3d 151, 158 (1st Cir. 1998); Fed. R. Civ. P. 56(c).  To defeat summary judgment in the trial court, the plaintiff must provide "specific facts showing that there is a genuine issue of material fact as to each issue upon which [s]he would bear the ultimate burden of proof at trial," an obligation that is triggered once the defendant has properly supported its summary judgment motion.  Hodgens, 144 F.3d at 158 (internal quotation marks omitted).  "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Id. (internal quotation marks omitted); see also Godfrey v. Globe Newspaper Co., Inc., 928 N.E.2d 327, 333 (Mass. 2010) (noting that while "[s]ummary judgment is generally disfavored in cases involving employment discrimination because the question of intent requires a credibility determination," it nonetheless "may at times be appropriate").

## A. Scope of Summary Judgment Record

Henry first challenges the district court's decision to strike from her Rule 56 Statement of Material Facts an assertion that the CHCP form completed by her PCP's office had "mistakenly" characterized her health status and endorsed her ability to work with minimal limitation. The court did not commit error.

At bottom, the plaintiff's belief that the statements were wrong does not affect the PCP's stated position as represented on the form. Henry offered no evidence that the PCP's office ever modified or otherwise corrected any perceived error. Further, as noted by the magistrate judge, the neurologist's opinion (memorialized in the September 24 note) that Henry had been unable to work since July 1 does not necessarily override the PCP's opinion because the conflict could simply represent a difference in medical opinions. In any event, even assuming that the form mistakenly characterized Henry's work abilities, she has not demonstrated how this conclusion helps establish that the bank acted unlawfully when it decided to terminate her on the stated ground that it could not hold the position open indefinitely. We find no abuse of discretion in the magistrate's decision to strike the statement, see Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668, 681 (1st Cir. 1994), and turn next to Henry's claim that this case should be resolved by a jury.

## B. FMLA Retaliation Claim

The Family and Medical Leave Act entitles eligible private sector employees to take, for medical reasons, reasonable leave up to a maximum of twelve weeks, and then to return to the same or an alternative position with some equivalency. See Hodgens, 144 F.3d at 159; 29 U.S.C. §§ 2612(a)(1)(D), 2614(a)(1). The Act also prohibits employers from retaliating against employees for exercising their statutory rights. See 29 U.S.C. § 2615(a). Thus, an employer cannot regard the taking of FMLA leave as a negative factor in deciding to terminate an employee. See 29 C.F.R. § 825.220(c); Mellen v. Trustees of Boston Univ., 504 F.3d 21, 26-27 (1st Cir. 2007). But, although an employee who properly takes FMLA leave cannot be discharged for exercising a right provided by the statute, she nevertheless can be discharged for independent reasons. Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F.3d 1, 3 (1st Cir. 2009).[1]

Henry's claim challenges United Bank's motivation for terminating her, and she acknowledges that the McDonnell Douglas burden-shifting framework applies. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Hodgens, 144 F.3d at 160 (noting that the burden-shifting framework applies when there is no direct evidence of discrimination); Colburn v. Parker

---

[1] This case does not require us to determine whether Henry was entitled to the FMLA leave that she received.

Hannifin/Nichols Portland Div., 429 F.3d 325, 336 (1st Cir. 2005); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141-49 (2000) (further explaining McDonnell Douglas framework in the summary judgment context).[2]

We will assume for the sake of argument that the plaintiff has satisfied her initial burden of establishing a prima facie case. See Hodgens, 144 F.3d at 161 (setting forth the elements of a prima facie FMLA retaliation claim). Additionally, because Henry does not challenge the magistrate judge's ruling that the bank satisfied its evidentiary burden under the second step of McDonnell Douglas, we also assume that the bank produced "enough competent evidence which, if taken as true, would permit a rational factfinder to conclude that the challenged employment action was taken for a legitimate, nondiscriminatory reason." Id. at 166 (internal quotation marks omitted). Nonetheless, we describe the evidence supporting the bank's proffered business decision -- that it could not hold Henry's position open indefinitely -- in order to set the stage for the final McDonnell Douglas prong on pretext, which is the crux of the dispute.

---

[2] Stated in simplified form, under this test the employee must first bring forward enough evidence to make out a prima facie case of discrimination; if the employer then provides a legitimate, nondiscriminatory reason for the employment action, the plaintiff must show that the employer's stated reason was pretextual. Hodgens, 144 F.3d at 161.

Siegal testified at her deposition that the credit analysis department was critical to the bank's business because the analysts perform credit risk assessments with respect to both potential and current commercial loans. She underscored that, in 2007, an independent auditing company had recommended that the bank maintain three credit analysts, and that the auditors were due to perform their bi-annual review of the bank's credit functions in the fall of 2008. At the time that the bank made its termination decision, Henry had been out of work for about three months. The two remaining analysts and Sheedy had taken on the extra work, which strained the department.

Siegal also testified that no other employee in the bank was available to temporarily fill the third analyst position, and that hiring a temporary employee was not a wise business practice, due to the confidential nature of the client information to which the credit analysts have access and the particularized training involved in preparing an employee to competently perform the job. Additionally, she explained that the analysts' loan review responsibilities were expected to increase for a variety of reasons. These included the fact that the poor state of the economy had created a need for increased financial documentation when scrutinizing credit-worthiness, and the fact that an increase in new loans was expected due to the bank having recently hired additional commercial lenders. Finally, Siegal testified that the

-11-

neurologist's note did not change the bank's decision to terminate Henry's employment, because the note gave no indication of a date by when she possibly might return to work.

In light of this undisputed evidence that the Bank's termination decision was animated by legitimate, nondiscriminatory reasons, any presumption of retaliatory animus created by the prima facie case evaporates. See id. at 160; see also Reeves, 530 U.S. at 142-43. Thus, to survive summary judgment, Henry's burden is to demonstrate, without the benefit of the animus presumption, a trialworthy issue on whether the stated reason was but a pretext for retaliating against her for having taken protected FMLA leave. Hodgens, 144 F.3d at 161; see also Reeves, 530 U.S. at 143.

Henry argues that, viewed in her favor, the summary judgment record would permit a jury to infer pretext and discriminatory animus. She focuses primarily on the circumstances leading up to her termination and on two remarks made by Sheedy in the workplace. Additionally, she contends that the record contains evidence that undermines the veracity of the bank's stated need to fill the third analyst position.

Henry first points to the employer's conduct leading up to her termination, including: (1) the bank's changed position about the status of her requested FMLA leave that it had initially approved; (2) Siegal's insistence that Henry return to work, despite being aware of her upcoming appointment to see the

neurologist; (3) Orr's demand that she have the CHCP form completed in mid-September, rather than allowing her to wait for the scheduled appointment with the neurologist; (4) the bank's failure to reconsider its termination decision once she informed Siegal that the PCP's statements in the CHCP form were mistaken; and (5) Orr's refusal to accept the neurologist's note on the morning of September 25.

We first note with respect to Orr's conduct that there is no evidence that she had anything to do with the decision to terminate Henry. See Colburn, 429 F.3d at 337. Additionally, we reject the argument that the bank took an inconsistent stance on the status of Henry's leave that is suggestive of pretext or bad motive. In late July, about three weeks into her absence, the bank simply sent her a letter stating that her FMLA leave began on July 1. In early September, after two months had passed since she left work, the bank informed Henry that her absence could not qualify as FMLA leave without proper medical documentation substantiating her claimed disabled status. The bank included a CHCP form in that correspondence, in order to assist her in providing the necessary documentation.

Neither do the circumstances surrounding the submission of the CHCP form itself suggest retaliatory animus. We detect nothing nefarious in Siegal's requiring that Henry return to work once the bank learned in mid-September that her PCP deemed her able

-13-

to do so with the minimal accommodation of "no heavy lifting." Further, although Henry told Siegal that the form was mistaken, she points to no evidence suggesting that the bank prevented her from submitting a modified form by the PCP to correct any perceived error. And, once the bank received the neurologist's note stating that she would be out of work "until further notice," it simply remained consistent in its position that it could not hold her job open indefinitely.

Henry highlights the temporal proximity between the conclusion of the 12-week FMLA leave period, Dr. Comey's note documenting her need for additional time, and her termination. Although timing can be relevant when considering whether there was retaliatory animus, the timing here is unremarkable. See id. at 170-71; Colburn, 429 F.3d at 337-38. The undisputed facts show that the decisionmakers began discussing staffing issues related to Henry's continued absence in early September, and, before ever receiving the neurologist's note, Siegal notified Henry that the bank could not hold her position open indefinitely, setting September 25 as the date for her to return to work.

We next consider the workplace comments made by Sheedy. Viewed in the context offered by the record, we agree with the magistrate judge that neither comment can be understood fairly to communicate a discriminatory or retaliatory message. First, during a telephone call with Siegal in mid-September discussing her need

-14-

to remain out of work, Henry apparently heard Sheedy in the background exclaiming "What did I do to you? Did I do something to you?" Even assuming that this background remark was directed at the plaintiff, it does not reflect any FMLA-related animus.

The second comment, according to Henry, was made while another employee was out on disability leave. In Henry's presence, Sheedy asked whether "anybody [had] heard from Dan or his wife on when he's coming back to work," and later, when the co-worker's spouse called the office, Sheedy remarked that he was a "wuss" and "needed to get a back bone." Nothing in the record connects this stray remark to Henry's medical leave. Suffice to say, neither of Sheedy's comments help create a triable issue on pretext and motive.

Finally, Henry attempts to discredit the evidentiary basis for the bank's stated reason for terminating her. Relying on her own deposition testimony, she contends that the bank could have hired a temporary employee because her job was not a complicated one and the bank could have taken extra precautions to ensure that any such employee treated confidential customer information in an appropriate manner. Similarly, she challenges the bank's perspective on the increasing workload of the credit analysis department, and the purported immediate need for three credit analysts. These iterations, as well as the others she raises in her brief, constitute mere disagreement with her employer's

business decisions and do not display the kind of weaknesses or implausibilities that give rise to a triable question on pretext.[3] Cf. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007) ("In the absence of some other proof that the decisionmaker harbored a discriminatory animus, it is not enough that [the employer's] perception may have been incorrect.  Rather, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given." (citations omitted)).

In sum, Henry does no more than raise tenuous insinuations on the facts surrounding her termination and the bank's reason for taking that action.  This is insufficient to create a triable issue on discriminatory or retaliatory animus. See Roman v. Potter, 604 F.3d 34, 40 (1st Cir. 2010); see also Reeves, 530 U.S. at 148.  Indeed, the undisputed facts reflect that the bank made several workplace accommodations for Henry from the time that she began displaying physical symptoms in January 2008. While she was out of work, it held her position open for 12 weeks and contributed to her group health insurance during that period,

---

[3] There is only one piece of evidence offered by the plaintiff that potentially belies the stated needed to fill the third analyst position.  Henry testified in her deposition that in May and June of 2008, before she began her leave time, the credit analysis department "was slow" because "[t]he market was tumbling" to such an extent that she was performing "idle work."  However, this does not answer the evidence that the bank had hired two more commercial lenders in 2008 and thereby anticipated having more borrowers for credit analyst review.  Nor does it undermine the evidence that the auditing company had recommended that the department be stocked with three full-time analysts.

despite its view that she failed to provide appropriate medical documentation supporting FMLA leave.  And there is no evidence of contemporaneous statements made by the decisionmakers suggesting retaliation for her requesting and taking leave.  In the end, the plaintiff's attempt to establish a triable issue on pretext and motive comes to naught.  See Jones, 679 F.3d at 21-22; Hodgens, 144 F.3d at 167 Reeves, 530 U.S. at 147-48; cf. Roman, 604 F.3d at 40 (explaining that the employee's individual belief that the adverse employment action was motived by retaliatory animus is not enough to show pretext or animus).

## C. State Law Claims under Chapter 151B

In her brief, Henry advances three state law theories for relief under Massachusetts General Laws ch. 151B:  disparate treatment, retaliation, and failure to provide a reasonable accommodation.[4]  As Chapter 151B is considered the state analogue

---

[4] Massachusetts General Law Chapter 151B, § 4(4), provides:

> It shall be an unlawful practice . . . [f]or any . . . employer . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

Massachusetts General Law Chapter 151B, § 4(16), further provides:

> It shall be an unlawful practice . . . [f]or

-17-

to the Americans with Disabilities Act (ADA), Massachusetts courts look to cases decided under the federal counterpart to inform its interpretation; we do likewise as needed.  See Jones, 679 F.3d at 13-14; Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1062 n.6 (Mass. 2002).

We may address the first two state law claims -- disparate treatment and retaliation -- summarily.  Premising these claims on the same operative facts as her federal FMLA retaliation claim, Henry asserts that the bank discriminated against her by terminating her because of her medical disability, and retaliated against her for requesting and taking medical leave.[5]  Our conclusion on her federal claim, however, is equally fatal to these state law claims because the evidence on pretext and discriminatory intent is no stronger.  See Sensing v. Outback Steakhouse of Fla.,

> an employer . . . to dismiss from employment . . . or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

[5] See Godfrey, 928 N.E.2d at 333 (generally setting forth the elements of a disability discrimination claim under Mass. Gen. Law ch. 151B § 4(16)); Mole v. Univ. of Mass., 814 N.E.2d 329, 338-39 (Mass. 2004) (generally setting forth the elements of a retaliation claim under Mass. Gen. Law ch. 151B § 4(4)).

LLC, 575 F.3d 145, 154 (1st Cir. 2009) (noting that Chapter 151B employment discrimination cases follow the McDonnell Douglas framework); Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d 1075, 1084-86 (Mass. 2000) (same).

As a final matter, Henry argues that the district court incorrectly analyzed her failure-to-accommodate claim. She says that the magistrate judge required her to show discriminatory animus, even though there is no animus requirement in establishing that an employer failed to provide a disabled person with a reasonable accommodation. In this respect, however, she has on appeal impermissibly attempted to recast her complaint as including an independent reasonable accommodation claim under the ADA and Chapter 151B.

First, the only federal claims in the complaint are expressly asserted to be violations of "the Family Medical Leave Act - 29 U.S.C. § 2601, et. seq." Next, while two counts do assert state claims under Chapter 151B, they are entitled "Discrimination and Harassment" and "Retaliation," respectively. More so, the operative allegations point to "harass[ment]" and "adverse action" that the bank allegedly took against Henry because of her "medical condition and/or handicap" and her having requested and taken medical leave. Thus, it is doubtful that either state law count can be read fairly to lodge an independent reasonable accommodation claim under Chapter 151B. Moreover, it does not appear that Henry

argued in the district court that it had misread the complaint, and she makes no effort on appeal to parse her own complaint to illustrate the putative independently-raised claim.  In any event, even assuming that the complaint does allege a state law reasonable accommodation claim, the claim nevertheless fails.

Generally stated, a disability discrimination claim based upon a failure to accommodate requires a plaintiff to show that: (1) she is a handicapped person within the meaning of the statute; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of her disability but did not reasonably accommodate it upon a request.  Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010) (reciting the tandem legal standards for a reasonable accommodation claim under the ADA and Chapter 151B); see also Russell, 772 N.E.2d at 1054 (noting that the employee bears the initial burden to request reasonable accommodation in order to be able to perform his existing duties).

With respect to extended medical leave, the Supreme Judicial Court of Massachusetts has held that "[a] request for a limited extension, setting a more definite time for the employee's return to work, may . . . constitute a reasonable accommodation . . . based on the circumstances." Russell, 772 N.E.2d at 1064.  It also has held, however, that "[a]n open-ended or indefinite leave extension" does not constitute a reasonable accommodation under

Chapter 151B.  Id.[6]  Russell relied on analogous federal case law to the effect that the term "reasonable accommodation" connotes one "which presently, or in the immediate future, enables the employee to perform the essential functions of the job."  Id. (internal quotation marks omitted).  Here, the record does not give rise to a jury question on whether Henry's apparent request for extended leave constitutes a reasonable accommodation.

From July through September, United Bank received several communications from Henry's medical providers documenting her inability to work.  While one note that the bank received from Henry's PCP in July suggested that she may return to work after three more weeks of leave time, ultimately she did not.  And although her PCP indicated (in the CHCP form provided to the Bank in mid-September) that the plaintiff was able to work with a slight restriction, Henry says that this was an error.  Thus, as of the date of her termination, the plaintiff could not work in her position at all and had given the bank neither a relative time frame for her anticipated recovery nor any indication of when or whether she would ever be able to return to her credit analyst position in the future.

---

[6] To the extent that the appellant suggests that the bank was required to hold open an alternative position during her leave, we disagree.  See, e.g., Godfrey, 928 N.E.2d at 336 ("Neither elimination of an essential duty from a position nor assignment to an unrelated position are 'reasonable accommodations' within the meaning of G.L. c. 151B, § 1.")

Henry counters that the content of the September 24 neurologist's note creates a factual issue about whether it would have been reasonable for the bank to have provided an additional three-week extension for her to undergo surgery and allow time for a proper diagnosis to be made. While there may be circumstances in which a request to wait for a medical diagnosis may constitute a reasonable accommodation, such is not the case here.

Upon exhaustion of her FMLA leave, Henry had been out of work for three months, and the bank had informed her on September 22 that it could not hold her position open indefinitely, requiring her to return to work on September 25. Even after the long-awaited appointment with the neurologist on September 24, Henry provided the bank with only a generally stated note that she had been unable to work since July 1, surgery would be scheduled in a few weeks, and she must remain out of work "until further notice." The record is devoid of even an estimate as to expected recovery time or the possibility that she may be able to perform any portion of the essential functions of her sedentary credit analyst position.[7]

Such an open-ended request for additional leave is just the type of wait-and-see approach that has been rejected as giving rise to a triable issue on reasonable accommodation. See, e.g., Russell, 772 N.E.2d at 1065 (concluding that the employee failed to

---

[7] The fact that Henry later fully recovered by April 2009 is immaterial since neither party knew as of September 25, 2008 when and whether she would be able to return to work.

demonstrate a triable issue on reasonable accommodation when at the time the employee requested a leave extension, "she did not indicate when (if ever) she would be able to return to her position"); Scott v. Encore Images, Inc., 955 N.E.2d 319, 325 (Mass. App. Ct. 2011) (concluding that the employer was not required to provide the possible accommodation of an indefinite leave of absence).

The federal case law relied upon by the appellant does not persuade us otherwise; the circumstances of each cited case differ materially from this one. Cf. Garcia-Ayala, 212 F.3d at 647-48 (finding that the employee's request for a leave extension was a reasonable accommodation given that the employee proffered a definitive date, the employer had been relying on help from temporary agencies, and the employer's termination decision centered on per se compliance with company leave policy rather than on its business needs); Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998) (concluding that a factual issue remained about whether a request was reasonable where the employee offered "evidence tending to show that her leave would be temporary and would allow her physician to design an effective treatment program," and it was undisputed that the leave would not produce an undue burden on the employer).[8]

_____

[8] The appellant's reliance on the federal district court decision Fink v. Printed Circuit Corp., 204 F. Supp. 2d 119 (D. Mass. 2002), is of little help to her. That case does not endorse

Because the extended leave requested by Henry is not a reasonable accommodation, the bank had no obligation to show that the request would impose an undue burden on its business or to engage in the informal interactive process.  See Godfrey, 928 N.E.2d at 333-34, 337.  And, to the extent that such burdens may be relevant to the reasonable accommodation mix in this case, the claim still falls short.  There is no material factual issue on the bank's need to fill Henry's position, and no trier of fact could reasonably find on this record that the bank was required to go further than it did to accommodate Henry, especially since she remained firm in her stance that she could perform no part of her duties for an indefinite time.  See Jones, 679 F.3d at 19-20.

This ends the matter.

### III. Conclusion

We **affirm** the judgment in favor of United Bank.

---

non-definitive requests for extended leave time as reasonable accommodations.  See id. at 127-28 ("The instant case certainly approaches . . . an open-ended time frame" which is unreasonable as a matter of law, but "[a]t this point in the litigation . . . this Court cannot conclude that the plaintiff sought a per se unreasonable accommodation."). Indeed, the particular circumstances before us are more in line with another, recent district court decision. See Cailler v. Care Alternatives of Mass., No. 09-12040, 2012 WL 987320, at *5-6 (D. Mass. March 23, 2012) (ruling on summary judgment that the employee had failed to establish that an extended leave was a possible reasonable accommodation where she remained unable to perform her job after exhausting FMLA leave time and participating in the company's modified work plan, and her physician was unable to provide an estimated time for recovery and return to work date).